**ROWAN COMPANIES, INC., Appellant,**

v.

**WILMINGTON TRUST COMPANY, Not in Its Individual Capacity but Solely as Owner Trustee of the Rowan–Halifax Jack–Up Rig, Textron Financial Corporation, North Sea Investments, Inc., and North Sea (Connecticut) LP, Appellees.**

No. 14–07–00465–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Oct. 8, 2009.

Rehearing En Banc Overruled Feb. 4, 2010.

Jim Taylor, David M. Gunn, David J. Beck, Houston, for appellant.

John Ellis O'Neill, Reagan Douglas Pratt, Stephen G. Tipps, Houston, Joseph R. Knight, Austin, for appellees.

Panel consists of Justices FROST, SEYMORE, and GUZMAN.

## SUBSTITUTE MAJORITY OPINION

EVA M. GUZMAN, Justice.

We deny the appellees' motion for rehearing, but to clarify the scope of remand, our majority and dissenting opinions of March 31, 2009 are withdrawn and these substitute majority and substitute dissenting opinions issued in their respective places.

In this summary-judgment appeal, bareboat charterer Rowan Companies, Inc. challenges the trial court's judgment in favor of the Wilmington Trust Company, the Owner Trustee of the oil rig Rowan–Halifax. Rowan argues that the Owners improperly invoked an appraisal provision in their contract with Rowan after the oil rig was destroyed by a hurricane, thereby impermissibly increasing the rig's estimated residual value, and hence, the amount Rowan was contractually required to pay for loss of the rig. We agree, and therefore, reverse and remand.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Rowan Companies, Inc. ("Rowan") is an international offshore and land drilling contractor. In 1984, Rowan entered into a sale/leaseback transaction involving the Rowan–Halifax 166–C jack-up drilling rig (the "Halifax"). The transaction was accomplished through a Participation Agreement and a bareboat charter (the "Charter"), both dated December 1, 1984 (collectively, the "Operative Documents"). The parties to the Participation Agreement included Rowan as Charterer, Textron Financial Corporation ("Textron") as Owner Participant, and Wilmington Trust Company ("Wilmington") as Owner Trustee.[1] The Charter provided that "so long as the Charterer's Stockholders' Equity is at least $400,000,000, the Charterer may self-insure up to the excess of the SLV [i.e., Stipulated Loss Value] Amount over $55,000,000 . . . ."

### A. Initial Appraisal

The Participation Agreement required, as a condition precedent, that Textron receive appraisals of the Halifax by Rush Johnson Associates and Lowell Johnston & Associates, Inc. Both appraisals were to

---

1. Various bond purchasers and an indenture trustee were also parties to the Participation Agreement but are not parties to the underlying suit or to this appeal.

be dated as of the Closing Date of the contract, contractually defined to mean December 28, 1984. Each appraisal was required to contain the appraiser's estimates that, as of that date, (1) the Halifax's fair market value was $66.5 million, (2) the remaining useful life of the vessel at the end of the Basic Term was at least 22 years, and (3) the Halifax's residual value at the end of the Basic Term was not less than twenty percent of the owner's cost for the Vessel, defined to be $66.5 million.[2] In section 18 of the Charter, the parties also provided for a Renewal Option, the terms of which are discussed further *infra* and set forth in full in the appendix to this opinion.

On December 26, 1984, Larry Hasty of Rush Johnson Associates appraised the Halifax and opined that:

- The expected useful life of the rig in December 1984 was "at least" twenty years.
- The Estimated Residual Value at the end of a sixteen-year lease period was "estimated to be twenty (20) percent of the *current* fair market value, determined without including in such value any increase or decrease for inflation or deflation during the lease and after subtracting any costs to the rig's owner for redelivery of the rig." [3]
- A remaining useful life of five years was "a reasonable estimate of what the remaining useful life of the rig" would be at the end of the original sixteen-year lease term.
- It was "reasonable to assume" that it would be commercially feasible that the rig would be usable by someone other than the lessee or an affiliate of the lessee at the end of the original

sixteen-year lease term, and it could be expected that the twenty percent residual value would be realized at that time.

- The current fair market value of the rig was $66.5 million.

There is no evidence in the record that Textron obtained an appraisal from Lowell Johnston & Associates, Inc., and the parties do not state if this condition was performed or whether any party objected to its non-performance.

## B. Contract Performance

The Basic Term of the Charter passed uneventfully and expired in September 2000. Rowan exercised its option to renew the Charter, and the parties agreed to a Renewal Term of seven-and-one-half years. On August 15, 2005, Jane M. Lavoie, Textron's vice president of operations, wrote to Bill Wells, Rowan's treasurer and vice president of finance, questioning the adequacy of Rowan's insurance coverage of the Halifax:

The insurance certificates provided to us for the current year indicate that the hull insurance ... on the Halifax is for $43.35 million. While we do not claim to be experts on the current market value of these assets, we note that a recent Jefferies & Company report estimates the fair market value of 116C rigs to be $75 million and the replacement cost to be $125 million. We understand that the Jefferies reports include information provided by Rowan. If this information is correct, it appears that the hull insurance on these rigs needs to be substantially increased.

In late September 2005, Hurricane Rita struck the Gulf Coast, leaving no trace of

---

2. This figure was to be calculated "without taking into account the effects of inflation or deflation and costs of removal" to Textron or Wilmington. In addition, the appraiser was to opine that the Halifax does not constitute

"limited use property" as that term is used in Rev. Proc. 76–30.

3. Note that this estimate does not say "at *least* twenty percent."

the Halifax. The vessel was presumed sunk, and Rowan gave notice to Wilmington on October 5, 2005 that the rig had been destroyed. Rowan's hull insurer paid policy limits exceeding $43.35 million on the claim, and in February 2006, the parties agreed to place the insurance proceeds in an escrow account until their dispute over ownership of the proceeds could be resolved.

## C. The Declaratory Judgment Action

On November 3, 2005, Rowan filed a petition for declaratory relief against Textron and Wilmington, in Wilmington's capacity as Owner Trustee of the Halifax.[4] On November 29, 2005, Wilmington notified Rowan that it was invoking the Appraisal Procedure as that term is defined in the Operative Documents. Textron and Wilmington (collectively, the "Owners") asserted counterclaims for breach of contract, declaratory judgment, and attorneys' fees.

On or about March 13, 2006, Rowan informed Wilmington that it calculated the Stipulated Loss Value of the Halifax to be $22,840,898.93, plus accrued interest.

Rowan eventually paid Wilmington this amount, which included the Basic Hire of $2,617,489.13 payable on March 15, 2006.

On March 15, 2006, Wilmington wrote to advise Rowan that it had not received payment of the Stipulated Loss Value, which, according to its calculations, was $80,235,317.37; this amount was based on the post-loss appraisal which Wilmington organized. In addition, Wilmington stated that the Basic Hire payment of $2,617,489.13 due on March 15, 2006 had not been paid,[5] and notified Rowan pursuant to Section 15(a) of the Charter that if the full Stipulated Loss Value was not paid by close of business on March 17, 2006, a contractual "Event of Default" would occur.[6]

## D. Cross–Motions for Summary Judgment

The Owners moved for traditional summary judgment, asserting that Rowan owed Wilmington $59,882,522.06 plus interest under the terms of the Charter.[7] In addition, they asked the trial court to declare their rights under the insurance provisions of their contracts with Rowan[8] and

4. Textron subsequently assigned its beneficial interest in the Participation Agreement and the Charter to its subsidiary, North Sea Investments Inc. Rowan later agreed to North Sea Investments Inc.'s substitution as Owner Participant through an Assumption and Assignment of Participation Agreement. On July 31, 2006, North Sea (Connecticut) LP intervened in the suit, alleging that it "owns a right to share in the economic benefits owed to North Sea by Rowan...." We therefore include North Sea Investments and North Sea (Connecticut) LP in our use of the name, "Textron."

5. Under the terms of the escrow agreement, this amount was to be paid by the escrow agent on March 15, 2006. The record is not clear regarding the date on which this occurred.

6. Five days after the date of Wilmington's letter, Rowan filed a first amended original

petition for damages and declaratory relief, adding Textron subsidiary CP Offshore LLC as a defendant and adding claims concerning the Cecil Provine rig. Rowan alleged that, just as North Sea succeeded to Textron's interest in the Rowan–Halifax rig, CP succeeded to Textron's interest in the Cecil Provine rig. Rowan also added a claim in quantum meruit for insurance premiums it incurred to insure the Cecil Provine for its full market value, rather than its Stipulated Loss Value.

7. This figure represents the sum of the Basic Hire payment and its calculation of the Stipulated Loss Value, reduced by the amount that Rowan already had paid based on its own calculations.

8. In addition, Textron, North Sea, and Wilmington asked the trial court to dismiss Rowan's claim for increased insurance premiums on a second rig, the Cecil Provine, which was

award attorneys' fees incurred in prosecuting their contract claim. According to the Owners, Rowan failed to make payments that were due on March 15, 2006 resulting from the loss and failed to maintain adequate insurance. In its cross-motion for traditional summary judgment, Rowan asked the trial court to declare that it had paid all amounts due under the Charter provision governing payments due in the event of a loss. In addition, Rowan asked the trial court to direct the escrow agent to pay Rowan all remaining hull insurance proceeds.[9]

On March 7, 2007, the trial court denied Rowan's motion for summary judgment and granted in part the Owners' motion for summary judgment. Although the trial court did not state the grounds for its judgment, it ruled that the Owners' motion was "granted as set out [in the trial court's final judgment] and otherwise denied." Specifically, the court ordered Rowan to pay Wilmington (1) $59,882,522.06; (2) interest on that sum in the amount of $3,467,364.37 through October 31, 2006; (3) interest from and including November 1, 2006 through and including March 6, 2007 at the rate of $15,386.48 per day; (4) $500,000 for reasonable and necessary attorneys' fees; and (5) post-judgment interest on the sum of all of these amounts. In

addition, the trial court declared that Wilmington "is entitled to recover all proceeds paid from any hull and machinery policies on the Halifax which were in effect at the time of its loss, including specifically those proceeds deposited in the escrow account which the parties jointly established...." Finally, the trial court explained that all proceeds previously paid to Wilmington had been credited in calculating the judgment. Rowan's motion for new trial was overruled by operation of law, and this appeal timely ensued.

## II. Issues Presented

In a single issue, Rowan contends the trial court erred in denying its motion for summary judgment and granting summary judgment in favor of the Owners.

## III. Standard of Review

We review summary judgments de novo, *Valence Operating Co. v. Dorsett,*[10] and if the trial court grants the judgment without specifying the grounds, we must affirm if any of the grounds presented are meritorious. *FM Props. Operating Co. v. City of Austin,* 22 S.W.3d 868, 872–73 (Tex. 2000). We consider all grounds preserved for review that are necessary for final disposition of the appeal. *See Cincinnati*

---

subject to a similar sale and leaseback agreement. Claims regarding the Cecil Provine were severed from the case.

9. Before ruling on the cross-motions for summary judgment, the trial court signed two severance orders. By agreement of the parties, the trial court severed Rowan's quantum meruit claims against the Owners. In addition, the trial court granted the Owners' motion to sever their claims against Rowan for (1) breach of contract for failure to pay expenses for the Halifax Appraisal Procedure; (2) breach of contract for failure to indemnify the Owners for the loss of the Halifax; (3) relief sought pursuant to section 16(b) of the Halifax Charter; (4) a declaration of the Owners' right to remedies under section 16(b)

of the Halifax Charter; (5) a declaration of the Owners' rights regarding Rowan's continuing obligation to insure the Cecil Provine rig, including the Owners' rights under sections 9(a) and 12(b)(ii) of the Cecil Provine Charter; (6) a declaration of the Owners' continuing right to have the Stipulated Loss Value for the Cecil Provine decided by the Appraisal Procedure; and (7) all relief requested in the Owners' pleadings relating to such claims, including requests for damages, interest, and attorneys' fees. The latter order was "intended to sever and consolidate ... all claims and issues not decided with respect to the motions for summary judgment filed by the parties in this action."

10. 164 S.W.3d 656, 661 (Tex.2005).

*Life Ins. Co. v. Cates,* 927 S.W.2d 623, 626 (Tex.1996). In a traditional motion for summary judgment, the movant has the burden of showing that there is no genuine issue of material fact and it is entitled to judgment as a matter of law. TEX.R. CIV. P. 166a(c); *Am. Tobacco Co. v. Grinnell,* 951 S.W.2d 420, 425 (Tex.1997). To be entitled to a final traditional summary judgment, a defendant must conclusively negate at least one essential element of each of the plaintiff's causes of action or conclusively establish each element of an affirmative defense. *Sci. Spectrum, Inc. v. Martinez,* 941 S.W.2d 910, 911 (Tex.1997). Evidence is conclusive only if reasonable people could not differ in their conclusions. *City of Keller v. Wilson,* 168 S.W.3d 802, 816 (Tex.2005). Once the defendant establishes its right to summary judgment as a matter of law, the burden shifts to the plaintiff to present evidence raising a genuine issue of material fact. *City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 678–79 (Tex.1979).

When, as here, both sides move for summary judgment, each bears the burden of establishing that it is entitled to judgment as a matter of law; neither side can prevail because of the other's failure to discharge its burden. *City of Garland v. Dallas Morning News,* 969 S.W.2d 548, 552 (Tex. App.-Dallas 1998) (en banc), *aff'd,* 22 S.W.3d 351 (Tex.2000). On appeal, we review all summary-judgment evidence, determine all questions presented, and render the judgment the trial court should have rendered. *Valence Operating Co.,* 164 S.W.3d at 661. We may affirm the judgment, reverse and render a judgment for the other side if appropriate, or reverse and remand if neither party has met its summary-judgment burden. *Hackberry Creek Country Club, Inc. v. Hackberry Creek Home Owners Ass'n,* 205 S.W.3d 46, 50 (Tex.App.-Dallas 2006, pet. denied).

## IV. CHOICE OF LAW

The resolution of this dispute is determined by the meaning of the contract term "estimated residual value." Before we can analyze this phrase under the correct rules of contract construction, we must determine which law applies to the various documents governing the transactions between the parties.

### A. The Charter

■ The parties agreed that the "Charter shall in all respects be governed by, and construed in accordance with, the general maritime laws of the United States of America and otherwise by the laws of the State of New York." When a dispute is not inherently local, federal law controls the interpretation of a maritime contract. *Norfolk S. Ry. Co. v. Kirby,* 543 U.S. 14, 22–23, 125 S.Ct. 385, 160 L.Ed.2d 283 (2004) (citing *Kossick v. United Fruit Co.,* 365 U.S. 731, 735, 81 S.Ct. 886, 6 L.Ed.2d 56 (1961)). The determination of whether an agreement constitutes a maritime contract subject to federal maritime law depends upon "the nature and character of the contract" and whether it has "reference to maritime service or maritime transactions." *Id.* at 23–24, 125 S.Ct. 385 (quoting *N. Pac. S.S. Co. v. Hall Bros. Marine Ry. & Shipbuilding Co.,* 249 U.S. 119, 125, 39 S.Ct. 221, 63 L.Ed. 510 (1919)). Because "a charter party is a classic example of a maritime contract," federal law governs its interpretation. *See Fontenot v. Mesa Petroleum Co.,* 791 F.2d 1207, 1214 (5th Cir.1986); *Novoship (UK) Ltd. v. Ruperti,* 545 F.Supp.2d 328, 332 (S.D.N.Y. 2008) ("There can be no dispute that the contracts at issue here—charter party contracts—should be considered maritime contracts.").

■ Federal maritime law "is an amalgam of traditional common-law rules, modifications of those rules, and newly created

rules." *E. River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 865, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986). When interpreting a maritime contract, the general rules of contract construction and interpretation apply. *See Marine Overseas Servs., Inc. v. Crossocean Shipping Co., Inc.*, 791 F.2d 1227, 1234 (5th Cir.1986).

## B. The Participation Agreement

■■■ Although the Halifax Charter and the Participation Agreement are part of the same transaction and therefore are interpreted together,[11] the rules of construction applicable to each are not necessarily the same.[12] The Participation Agreement is the contract by which Rowan committed to sell the Halifax to the Owners; unlike a charter party, contracts for the sale of a vessel are not maritime in nature. *See, e.g., Herman Family Revocable Trust v. Teddy Bear*, 254 F.3d 802, 804 (9th Cir.2001) (stating that contracts for the sale of a vessel are not maritime in nature); *Vrita Marine Co. Ltd. v. Seagulf Trading LLC*, 572 F.Supp.2d 411, 411 (S.D.N.Y.2008) (same). The parties agreed that the Participation Agreement "shall in all respects be governed by, and construed in accordance with, the laws of the State of New York applicable to agreements made and to be performed entirely within such State, including all matters of construction, validity and performance." Although the Owners cite New York law as well as the law of other jurisdictions in their motion for summary judgment, the extent to which the parties urge the application of New York law rather than federal maritime law to various contract provisions is unclear.[13] Thus, we apply the rules of contract construction set forth in federal maritime law to the Charter's provisions, and we interpret provisions of the Participation Agreement in accordance with Texas contract law except to the extent that the parties have provided sufficient briefing of New York law to allow us to apply the substantive law of that state. *See Coca-Cola Co. v. Harmar Bottling Co.*, 218 S.W.3d 671, 685 (Tex.2006) (noting that, absent proof or argument to the contrary, Texas courts generally may presume that the determinative law of another state is the same as Texas law).

## V. ANALYSIS

### A. "Estimated Residual Value"

It is uncontroverted that the Halifax disappeared when Hurricane Rita struck the Gulf Coast during the Renewal Term of the Charter. Under Section 12 of the Charter, the loss triggered Rowan's obligation to pay the Owners as follows:

> SECTION 12. *Loss, Destruction, Condemnation or Damage.* (a) *Payment of Stipulated Loss Value.* Upon the occurrence of an Event of Loss with respect to the Vessel, the Charterer shall forthwith ... give the Owner Trustee and the Indenture Trustee notice of such Event of Loss and, *on the next succeeding Hire Payment Date 60 days*

---

**11.** RESTATEMENT (SECOND) OF CONTRACTS: RULES IN AID OF INTERPRETATION § 202(2) (1979).

**12.** *See, e.g., Tetra Applied Techs., LP v. Henry's Marine Serv.*, No. H-04-2576, 2007 WL 1239240, at *2 (S.D.Tex. April 27, 2007).

**13.** We note, however, that if a party asks the court to take judicial notice of the laws of another state, the court must do so if the party provides the court with "sufficient information to enable it properly to comply with the request." TEX.R. EVID. 202. "A preliminary motion is necessary to assure the application of the law of another jurisdiction, and absent a motion by a party, Texas law may be applied to a dispute." *Burlington N. & Santa Fe Ry. Co. v. Gunderson, Inc.*, 235 S.W.3d 287, 290 (Tex.App.-Fort Worth 2007, pet. withdrawn) (citing *Pittsburgh Corning Corp. v. Walters*, 1 S.W.3d 759, 769 (Tex.App.-Corpus Christi 1999, pet. denied)).

*after such occurrence* (or, if earlier, the final scheduled Hire Payment Date) pay to the ... Owner Trustee an amount equal to the sum of (i) Stipulated Loss Value calculated as of such Hire Payment Date, (ii) ... Basic Hire due and payable on such Hire Payment Date and (iii) any other Hire then due and payable.

(emphasis added). The next succeeding Hire Payment Date sixty days after the loss fell on March 15, 2006, and, with the exception of the Hire Payment regularly scheduled for that date and the Stipulated Loss Value payable as a result of the loss, the parties do not contend that "any other Hire [was] then due and payable." Thus, on March 15, 2006, Rowan was required to pay (1) the Stipulated Loss Value calculated as of that date; and (2) the Basic Hire due on March 15, 2006. Rowan does not dispute that the Basic Hire due on that date was $2,617,489.13. The parties' disagreement arises from their differing interpretations of one of the components of "Stipulated Loss Value."

The Participation Agreement provides that, " 'Stipulated Loss Value' as of any date during any Renewal Term shall mean the amount determined pursuant to Section 18 of the Charter." Under section 18 of the Charter, Stipulated Loss Value on a given Hire Payment Date is defined to equal the sum of (1) the Basic Hire due on that date, (2) the present value on the Hire Payment Date of all remaining payments, and (3) the present value on the Hire Payment Date of the "estimated residual value." [14] The central dispute in this appeal concerns the meaning of the phrase "estimated residual value" as used in section 18(a)(B)(ii)(b) of the Halifax Charter.

Section 18(a) provides in pertinent part:
SECTION 18(a) *Fixed Rental Renewal Option.*

Such Renewal Term shall be for a period that, when added to the Interim Term and the Basic Term, shall not exceed 80% of the total estimated remaining economic useful life of the Vessel (measured from the Closing Date) as determined by the Appraisal Procedure ...; *provided, however,* that

(A) *at the end of such Renewal Term the Vessel will have an estimated residual value ... as determined in such Appraisal Procedure* of not less than 20% of the Owner's Cost for the Vessel and

(B) the use of the Vessel will, *as of the beginning of such Renewal Term and as determined in such Appraisal Procedure,* be reasonably expected to be commercially feasible (in a manner that would permit the Owner Trustee to realize the residual value described in the foregoing clause (A)) by some Person other than the Charterer who could charter or purchase the Vessel from the Owner Trustee at the end of such Renewal Term. In addition to the limitation set forth in the next preceding sentence, no Renewal Term pursuant to this paragraph (a) shall be entered into if it would end before one year after the commencement thereof. During such Renewal Term, all of the provisions of this Charter shall continue in full force and effect, **except** that

(ii) Stipulated Loss Value on each Hire Payment Date during such Renewal Term shall be equal to the sum of Basic Hire payable on such Date and the present value as of such Date of (a) Basic Hire that would have been payable over the balance of such Renewal Term and

---

**14.** Although Rowan argued in the trial court that Basic Hire was not a component of Stip- ulated Loss Value, it has abandoned that argument on appeal.

(b) the *estimated residual value as of the end of such Renewal Term* (present value to be determined by using a discount rate of 10% compounded semiannually) *as determined by the Appraisal Procedure.* (emphasis added).

Rowan contends that the phrase "estimated residual value" is a term of art with a recognized usage in the tax, accounting, and financial fields and is the estimate made at the beginning of the lease of the value of the vessel at the end of the lease. The Owners contend that "estimated residual value" is equal to the fair market value that the vessel would have commanded at the end of the Renewal Term if the loss had not occurred. After analyzing the agreements under the applicable rules of contract interpretation, we conclude that the interpretation advanced by Rowan is reasonable, and the interpretation described by the Owners is not. We therefore hold that the Halifax Charter is unambiguous and must be interpreted in the manner described by Rowan.

### 1. Intent of the Parties

Charter party agreements are a species of contract, and as such, they are subject to the general rules of contract law. *Marine Overseas Servs., Inc.,* 791 F.2d at 1234. Like other contracts, maritime contracts must be interpreted to give effect to each of the contract's provisions. *Am. Roll–On Roll–Off Carrier, LLC v. P & O Ports Baltimore, Inc.,* 479 F.3d 288, 293 (4th Cir.2007); *see also* RESTATEMENT (SECOND) OF CONTRACTS: RULES IN AID OF INTERPRETATION § 202(2) (1979) ("A writing is interpreted as a whole, and all writings that are part of the same transaction are interpreted together."). Our primary purpose in interpreting a maritime contract is to ascertain the intent of the parties. *F.W.F., Inc. v. Detroit Diesel Corp.,* 494 F.Supp.2d 1342, 1357 (S.D.Fla.2007).

Thus, we construe a charter "according to the intent of the parties as manifested by the whole instrument rather than by the literal meaning of any particular clause taken by itself." *The Rice Co. (Suisse), S.A. v. Precious Flowers Ltd.,* 523 F.3d 528, 534 (5th Cir.2008) (quoting *The Framlington Court,* 69 F.2d 300, 303 (5th Cir. 1934)); *see also F.W.F., Inc.,* 494 F.Supp.2d at 1357 ("The elementary canon of interpretation is, not that particular words may be isolately considered, but that the whole contract must be brought into view and interpreted with reference to the nature of the obligations between the parties, and the intention which they have manifested in forming them." (quoting *O'Brien v. Miller,* 168 U.S. 287, 297–300, 18 S.Ct. 140, 42 L.Ed. 469 (1897))); RESTATEMENT (SECOND) OF CONTRACTS: RULES IN AID OF INTERPRETATION § 202(1) (1979) ("Words and other conduct are interpreted in the light of all the circumstances, and if the principal purpose of the parties is ascertainable it is given great weight."). Contractual provisions are read in a manner that effectuates the contract's spirit and purpose, considered as a whole and interpreted so as to harmonize and give meaning to all of its provisions. *Arizona v. United States,* 575 F.2d 855, 863 (Ct.Cl. 1978). An interpretation that affords "a reasonable meaning to all parts will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result." *Id.*

### 2. Plain Language

Whenever possible, we consider the plain language of the contract first. *Flores v. Am. Seafoods Co.,* 335 F.3d 904, 910 (9th Cir.2003). Unless a different intention is manifested, we interpret language according to its generally prevailing meaning. RESTATEMENT (SECOND) OF CON-

TRACTS: RULES IN AID OF INTERPRETATION § 202(3)(a) (1979).

■■■■ In the phrase, "estimated residual value," to "estimate" means "[t]o set a value on or appraise," "[t]o form an approximate judgment or opinion regarding the value,'" or to "'[c]alculate approximately.'" *United States v. Foster*, 131 F.2d 3, 7 (8th Cir.1942). "Value," as used in the context presented here, refers to monetary worth. *See* WEBSTER'S THIRD NEW INT'L DICTIONARY, 2530 (Philip Babcock Gove, ed., 3d ed., 1993). More specifically, "residual value" is defined as the "[a]mount expected to be obtained when a fixed asset is disposed of at the end of its useful life (also called scrap or salvage value)." BLACK'S LAW DICTIONARY 1552 (6th ed. 1990).[15] Thus, the generally prevailing meaning of the words comprising the phrase "estimated residual value" as used in the Operative Documents suggests an approximate calculation of the monetary value of the vessel at the end of the lease term under discussion. This meaning is consistent with Rowan's argument that "estimated residual value" was required to be calculated before the loss, because after the vessel vanished, its approximate value at the end of the lease term would be nothing.

**3. Terms Used Elsewhere in the Operative Documents**

■■■ It is the Owners' position, however, that "estimated residual value" is calculated after an event of loss and is equal to the fair market value that the vessel would have had if the loss had not occurred. But every provision of a maritime contract must be read in light of the others so as to give each the meaning reflected by the contract as a whole. *Am. River Transp. Co. v. Morton Int'l, Inc.*, No. 06–6103, 2008 WL 2436176, at *1 (E.D.La. June 13, 2008). We therefore cannot ignore the fact that the parties have actually used the terms "fair market value" and "residual value" elsewhere in the contract to refer to non-equivalent valuations.[16] For example, section 3.01(j) of the Participation Agreement describes the following conditions precedent:

> The Owner Participant shall have received ... appraisals by Rush Johnson Associates and [L]owell [J]ohnston & [A]ssociates, [I]nc., in form and substance satisfactory to the Owner Participant ... and *dated the Closing Date*, stating in each case:
>
> (i) such appraiser's estimate of the *fair market value of the Vessel on the Closing Date*, which fair market value shall be equal to $66,500,000;
>
> (ii) such appraiser's *estimate as of the Closing Date* of the remaining useful life of the Vessel and the *residual value thereof at the end of the Basic Term* (without taking into account the effects of inflation or deflation and costs of removal to the Owner Participant or the Owner Trustee), which estimates shall be not less than 22 years and not less than 20% of Owner's Cost for the Vessel, respectively....

(emphasis added). Thus, the Participation Agreement required an initial appraisal of two different values. The first figure represented the vessel's then-current fair market value. The second figure was a

---

**15.** "Scrap value" is defined as "[t]he value of the constituent materials and components of a thing; not its value for the purpose for which it was made." *Id.*

**16.** *See also Taracorp, Inc. v. NL Indus., Inc.*, 73 F.3d 738, 744 (7th Cir.1996) (applying general principles of contract law and inferring that parties did not intend for two different phrases to mean the same thing); *Hubbell v. United States*, 4 Ct.Cl. 37, 1800 WL 608, at *3 (Cl.Ct.1868) ("Neither Congresses nor men are apt to say precisely the same thing over twice in different words....").

prediction, made before the lease term began, of the vessel's residual value when the lease term ended sixteen years later. This section of the Participation Agreement is noteworthy in that it illustrates that the parties did not use the terms "estimated residual value" and "fair market value" to refer to the same thing. Rowan's interpretation of "estimated residual value" is consistent with the parties' use of these words elsewhere in the contract to require an approximate calculation of the vessel's residual value in the future. In contrast, the Owners' interpretation of "estimated residual value" requires speculation regarding the fair market value the vessel *would have had* if it had survived.

Further, the Owners' interpretation requires the terms "residual value" and "fair market value" to be used in ways that not only are inconsistent with the use of these terms elsewhere in the contract, but which also render some contract provisions meaningless. For example, in section 16(b) of the Halifax Charter, the parties agreed that in the event of default,

> [T]he Owner Trustee may, within 30 days after the Charterer shall make the full payment of Basic Hire and Stipulated Loss Value as aforesaid, give the Charterer written notice requesting that the Fair Market Sales Value of the Vessel as of the date as of which Stipulated Loss Value was determined pursuant to clause (ii) of this Section 16(b) be determined. If the Fair Market Sales Value of the Vessel as of such date shall be determined to exceed the Stipulated Loss Value paid pursuant to the first sentence of this Section 16(b), the Charterer shall, within 60 days after such determination, pay the amount of such excess to the Owner Trustee.

If, as the Owners imply, estimated residual value is the same as fair market value, then this provision is meaningless. As

previously discussed, Stipulated Loss Value is the sum of estimated residual value plus the present value of remaining Basic Hire payments. If estimated residual value and fair market value are the same, then Stipulated Loss Value is the sum of fair market value plus the present value of remaining Basic Hire payments. Under this interpretation, it is mathematically impossible for fair market value ever to exceed Stipulated Loss Value, and this provision of the Charter is superfluous.

The Owners' interpretation also uses the word "estimate" in a manner inconsistent with its usage elsewhere in the contract. Although "estimate" is used in other provisions to refer to an approximate calculation based on known information, the Owners' use of the word "estimated" in its interpretation of the phrase "estimated residual value" requires an appraiser to calculate the fair market value of the vessel at the end of the lease term based on an assumption—the continued existence of the vessel—that is known to be false.

### 4. Rule of the Last Antecedent

■■■ Under the grammatical "rule of the last antecedent," "qualifying words, phrases, and clauses" are to be applied only to the immediately preceding words or phrase [17] and "are not to be construed as extending to and including others more remote." *Elliot Coal Mining Co., Inc. v. Dir., Office of Workers' Comp. Programs,* 17 F.3d 616, 629–30 (3d Cir.1994) (quoting *Azure v. Morton,* 514 F.2d 897, 900 (9th Cir.1975)). Pursuant to section 18(a)(B)(ii)(b) of the Charter, one component of Stipulated Loss Value is "the estimated residual value as of the end of such Renewal Term (present value to be determined by using a discount rate of 10% compounded semiannually) as determined by the Appraisal Procedure." Applying

---

**17.** *Barnhart v. Thomas,* 540 U.S. 20, 26, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003).

the rule of the last antecedent to this language, the phrase "as determined by the Appraisal Procedure" does not modify "estimated residual value" as the Owners contend, but instead modifies "such Renewal Term."[18]

### 5. Absurd Result

The unreasonableness of the Owners' interpretation is further illustrated by the inconsistent ways in which it deals with the effect of the hurricane on supply, demand, and value. The destruction of the Halifax and similar rigs decreased the supply of such vessels. Consequently—and as stated by the Owners' own appraisers—demand for such vessels after the hurricane exceeded supply.[19] Because demand exceeded supply, the market price for such vessels increased. *See United States v. Cors*, 337 U.S. 325, 333–34, 69 S.Ct. 1086, 93 L.Ed. 1392 (1949) (discussing analogous situation in which government demand for vessels in a time of national emergency outstrips supply, resulting in inflated prices for vessels and causing the market to be an unfair indication of value). Thus, when estimating the fair market value that

---

**18.** In their motion for rehearing, the Owners argue that Rowan did not contend the rule of the last antecedent applies. As a grammatical rule, however, it applies to the contract regardless of whether the parties point it out. Interpretation of a maritime contract is a matter of law, reviewable de novo on appeal. *Foreman v. Exxon Corp.* 770 F.2d 490, 496 (5th Cir.1985). General federal maritime law has adopted the general rules of contract construction, which include rules of grammar. *See F.T.C. v. Mandel Bros., Inc.*, 359 U.S. 385, 389–90, 79 S.Ct. 818, 822–23, 3 L.Ed.2d 893 (1959) (applying the rule of the last antecedent without suggesting that its application was urged by any party); *Sims' Lessee v. Irvine*, 3 U.S. 425, 445, 3 Dall. 425, n.a, 1 L.Ed. 665 (1799) ("The rule is, that 'such' applies to the last antecedent, unless the sense of the passage requires a different construction." (quoting Ellsworth, C.I.)). The rules of English grammar also apply under New York contract law. *See In re Enron Creditors Recovery Corp.*, 380 B.R. 307, 322 (S.D.N.Y. 2008) ("Under ordinary contract construction rules, the rules of English grammar apply. The rule of the last antecedent is such a rule."); *id.* at 319 ("[I]n line with the maxim that contract language is to be interpreted pursuant to the plain, ordinary and usual meaning of the words used, . . . a court should apply settled rules of grammatical construction unless it clearly appears that the parties intended otherwise.") (citation omitted). The Owners also contend that if we apply the rule of the last antecedent as we have done here, we must also apply it to the parenthetical in section 3.01(j)(ii). This premise, however, is incorrect. *See* R.W. Burchfield, The New Fowler's Modern English

Usage, 571 (rev. 3d ed., Oxford Univ. Press 2000) (describing a parenthesis as an "interruption" of a sentence and stating, "It is important to bear in mind that a parenthesis may or may not have a grammatical relation to the sentence in which it is inserted.").

**19.** One appraiser noted that Rowan Companies lost four offshore rigs as a result of Hurricanes Katrina and Rita. Another notes that "day rates at this time have increased dramatically over a short period of time." According to the appraiser, such rates were "approximately twice as high now compared to late 2002," which was the last time prior to the loss that a comparable rig was sold, and "the [fair market value] derived from the Cost Approach is not appropriate given the high day rates presently in the marketplace." He further stated that "[t]here are presently 43 jackups on order that will be delivered in the next three years" and "day rates will be moderate in 3 to 4 years as supply catches up with demand." The surveyor from ABS Consulting observed, "Naturally, if equipment is in high demand, the dayrate or earning capacity of any such unit is increased and this tends to have a proportionate increasing effect on value[,]" and, "among drillers, the tightest supply now is for jackup rigs such as the [Halifax]." "Jackup rig utilization has increased from 86% in April 2004 to effectively 100% as of the date of this report [2/22/06]. Also, rig charter dayrates have doubled in some regions since the third quarter of 2004 due to tight supply." The third appraiser stated, "It is obvious that we are currently in an extremely strong market, a seller's market." The ABS surveyor further observed that as of February 2006, rig demand exceeded supply.

a vessel such as the Halifax would have had at the end of the Renewal Term had it survived, the appraisers used market prices that were based in part on the destruction of the Halifax, among others. In effect, the Owners urge an interpretation that accounts for the effect of the hurricane on the market but ignores its effect on the rig. Instead of acknowledging the destruction of the vessel as a cause of decreased supply, the Owners treat the Halifax as the beneficiary of increased demand. This interpretation reaches an absurd result in which the destruction of the Halifax increased its value. In addition, it highlights another barrier to this interpretation: the absence of shared assumptions.

### 6. No Shared Assumptions for a Post–Loss Appraisal

The Operative Documents provide no set of shared assumptions on which a post-loss appraisal could be based. For example, Section 7(a)(ii) of the Charter requires the Charterer to "keep the Vessel in such condition as will entitle her to the highest classification and rating by the American Bureau of Shipping for vessels of the same age, type and use...." This obligation does not apply "during such period as ... an Event of Loss shall have occurred and be continuing...." Charter, § 7(a)(y). Thus, there is no agreement concerning the hypothetical condition of the vessel at the time of a post-loss appraisal. Nevertheless, the appraisers retained by the Owners used the assumption that the vessel was in the highest classification rating, despite the explicit contract provision that this assumption does not apply to an Event

of Loss. As a result, their opinions concern a hypothetical rig that not only survived the hurricane, but did so without significant damage. The absurdity of this result further illustrates that if the parties intended to permit the Appraisal Procedure to be invoked after a loss, they would have eliminated the exception in section 7(a)(y) of the Charter or otherwise agreed upon the assumptions they would apply regarding the vessel's hypothetical condition after its loss.[20]

### B. Timing of Appraisal Procedure

As the foregoing discussion demonstrates, the Operative Documents do not support an interpretation that the parties intended estimated residual value to be based on a post-loss appraisal. A close reading of these documents also demonstrates that the parties did not intend for the Appraisal Procedure to be invoked after the Renewal Term began.

### 1. Plain Language

As previously indicated, the parties agreed that the length of the Renewal Term would be determined by the Appraisal Procedure. In section 18(a)(A) and 18(a)(B) of the Charter, the parties agreed that "at the end of *such* **Renewal Term** the Vessel will have an estimated residual value ... as determined **in *such* Appraisal Procedure** of not less than 20% of the Owner's Cost for the Vessel and ... the use of the Vessel will, **as of the beginning of *such* Renewal Term and as determined in *such* Appraisal Procedure,** be reasonably expected to be commercially feasible ...." (emphasis added). The use

---

**20.** Because Rowan was required to repair damage costing as much as half of the estimated residual value, substituting a hypothetical fair market value for estimated residual value also skews Rowan's repair obligations: as the fair market value increases, the relative cost of repair decreases. Thus, if the Halifax survived with some damage, and we followed

the Owners' suggestion of substituting fair market value for estimated residual value, then Rowan's maximum responsibility for repair costs would increase from approximately $6.65 million to more than $40 million—based upon damage sustained by *other* vessels.

of the word "such" indicates that the length of the Renewal Term and the minimum estimated residual value are determined from the same Appraisal Procedure.[21] Similarly, in section 18(a)(B)(ii)(b), the Stipulated Loss Value on each Payment Hire Date during the Renewal Term includes "the estimated residual value as of the end of *such* Renewal Term ... as determined by the Appraisal Procedure." (emphasis added). This is the same Appraisal Procedure referred to earlier in section 18, i.e., the Appraisal Procedure utilized to determine both the length of the Renewal Term and to ascertain whether the minimum estimated residual value is at least twenty percent of the Owners' Cost.

As expressed in the language of section 18(a), the parties contemplated the use of a single Appraisal Procedure, which would determine (1) the vessel's remaining useful life measured from the Closing Date (i.e., the period used to determine the length of the Renewal Term), and (2) whether the estimated residual value was at least twenty percent of the Owners' Cost of $66.5 million—i.e., $13.3 million. Specifically, the Appraisal Procedure was to be used to calculate the Renewal Term within a range of one to seven-and-one-half years. The parties intended that the Renewal Term be determined before it began, and there is no indication in the Operative Documents that the length of the Renewal Term could be varied during the term as initially agreed upon by the parties. Thus, unless "Appraisal Procedure" means different things in different sentences of the same contract provision, then the Apprais-

al Procedure was intended to be used before the start of the Renewal Term to determine its length. Moreover, section 18(a) requires an appraiser to certify that the estimated residual value at the end of the Renewal Term will be at least $13.3 million. Significantly, this section contains no language requiring or permitting the adjustment of the estimated residual value.

The Owners' interpretation, however, requires us to ignore the word "such" and disconnect the determination of the Vessel's remaining useful life from the determination that the minimum estimated residual value is at least $13.3 million. Because this interpretation would render the word "such" meaningless, we cannot adopt this view.

### 2. *"Appraisal Procedure" Defined*

The contractual definition of "Appraisal Procedure" also supports Rowan's interpretation. In Appendix A of the Participation Agreement, "Appraisal Procedure" is defined as follows:

> *"Appraisal Procedure"* shall mean the procedure specified in the succeeding sentences for determining an amount, value or period. If the Owner Trustee and the Charterer *shall have been unable* to agree on such amount, value or period, and if either the Owner Trustee or the Charterer shall give written notice to the other requesting determination of such amount, value or period by appraisal, the Owner Trustee and the Charterer shall consult for the purpose of appointing a mutually acceptable qualified independent appraiser, who

---

**21.** *See Lechuga v. Tex. Employers' Ins. Ass'n,* 791 S.W.2d 182, 185 (Tex.App.-Amarillo 1990, writ denied) (explaining the ordinarily understood meaning of the word, "such"); *Coker v. Tex. Alcoholic Beverage Comm'n,* 524 S.W.2d 570, 574–75 (Tex.Civ.App.-Dallas 1975, writ ref'd n.r.e.) (holding that the word "such" refers back to preceding language; thus, in a statute that initially identifies "dry"

political subdivisions, a subsequent reference to "such" political subdivisions refers to those same identified subdivisions); *Warner Elevator Mfg. Co. v. Houston,* 28 S.W. 405, 408 (Tex.Civ.App.1894) (" 'Such' refers to what has been specified, and means 'the same as has been mentioned.' "), *rev'd on other grounds,* 88 Tex. 489, 31 S.W. 353 (1895).

shall be a marine surveyor. If such parties shall be unable to agree on an appraiser within 20 days of the giving of such notice, such amount or value shall be determined by a panel of three independent appraisers, each of whom shall be a marine surveyor.

(emphasis added).

The parties' rights to request appraisal is subject to the condition precedent that the parties "shall have been" unable to agree. In determining the meaning of this phrase, we apply normal grammatical rules. "Shall have been" is the future perfect continuous tense, "used to express a continuous, ongoing action which will be completed by a certain time in the future." [22] Here, it cannot be said that there was a continuous, ongoing failure to agree. To the contrary, the parties entered the contract and performed for 21 years— throughout the remaining existence of the rig—without any expression of disagreement regarding the variables required to be determined pursuant to section 18(a). Although the Owners essentially contend that they may require a formal appraisal if the parties *become* unable to agree, this is not what is stated in the definition provided by the Operative Documents. [23]

### 3. Adjustment of Stipulated Loss Value

The Operative Documents also provide that Stipulated Loss Value "shall be adjusted as required in Article IX of the Participation Agreement." Article IX of the Participation Agreement sets forth conditions under which Basic Hire, Stipulated Loss Value, and Termination Value are to be recalculated. These conditions

---

**22.** *See Ch. 7. The Future Tenses,* WORDPOWER, (2002–2009), http://www.wordpower.ws/grammar/gramch07.html; H. RAMSEY FOWLER, THE LITTLE, BROWN HANDBOOK, 155 (Little, Brown & Co. eds. 1980) ("The perfect tenses indicate that an action was or will be completed before another time or action."); *see, e.g., In re Eagle–Picher Indus., Inc.,* 190 B.R. 557, 562 (Bankr.S.D.Ohio 1995) (discussing lease provision agreeing that "Landlord shall have the right, but not the obligation, to terminate this Lease ... if by August 31, 1989 Landlord shall have been unable to obtain a commitment for both a non-recourse construction loan and a non-recourse permanent loan"); *Stabile v. McCarthy,* 336 Mass. 399, 403, 145 N.E.2d 821, 823–24 (1957) (holding that contract that was "subject to the right of the buyer in the event that he shall have been unable to obtain the approval of the Wilmington Planning Board of his proposed subdivision of the ... premises prior to the date ... set for performance ... at his option to cancel this agreement" required the buyer to prepare a plan conforming to the planning board regulations, and to try reasonably to obtain planning board approval prior to the date set for the conveyance, before condition precedent for contract cancellation was satisfied); *Wilmington United Neighborhoods v. U.S. Dep't of Health, Educ. & Welfare,* 458 F.Supp. 628, 645 (D.C.Del.1978) (discussing contract providing that "[i]If on July 1, 1978, litigation pending against Owner ... shall remain pending or shall have been resolved adversely to Owner, or if prior to such date Owner shall have been unable to obtain or obtain commitments for such financing then from and after July 1, 1978, Owner shall have the right to terminate the Contract by the giving of seven days prior written notice").

**23.** In addition, the rig arguably had already been appraised by "a mutually acceptable qualified independent appraiser" in 1984 pursuant to section 3.01(j) of the Participation Agreement. As a signatory to the contract, Rowan accepted Rush Johnson Associates as the marine surveying company to provide the Appraiser's Certificate. Thus, the December 1, 1984 contract can itself be considered "written notice to the other requesting determination of such amount, value or period by appraisal," and "the Owner Trustee and the Charterer" did appoint "a mutually acceptable qualified independent appraiser, who shall be a marine surveyor." This appraisal is "final and binding." If the initial agreed use of Rush Johnson Associates is the first use of the Appraisal Procedure, and the Owner is permitted to invoke the Appraisal Procedure again, then the contract language requiring the result of the appraisal procedure to be "final and binding" is rendered meaningless.

consist of (i) a change in the Closing Date, (ii) an increase in the Owner's transaction costs, and (iii) changes in the tax law. Notably, the occurrence of an "Event of Loss" or changes in the market are not listed among those conditions that necessitate or permit a mid-term adjustment to Stipulated Loss Value.

### 4. *Generally Accepted Accounting Principles*

 It has been said that, under general maritime law, a court may not look beyond the written language of the document to determine the intent of the parties unless the disputed contract provision is ambiguous. *Corbitt v. Diamond M. Drilling Co.,* 654 F.2d 329, 332–33 (5th Cir. 1981).[24] Although this is essentially a statement regarding the parol evidence rule, it excludes "only evidence of prior understandings and negotiations which contradicts the unambiguous meaning of a writing which completely and accurately integrates the agreement of the parties." *Battery S.S. Corp. v. Refineria Panama, S.A.,* 513 F.2d 735, 739–40 (2d Cir.1975). Conversely, when extrinsic evidence is considered for the purpose of interpretation, the parol evidence rule is inoperative. *Garza v. Marine Transp. Lines, Inc.,* 861 F.2d 23, 27 (2d Cir.1988). Having concluded that the unambiguous language of the Operative Documents demonstrates the intent of the parties to use the Appraisal Procedure not later than the start of the Renewal Term—and only if they have been unable to agree on an amount, value, or period—we further note that this conclusion is consistent with, but not dictated by, generally accepted accounting principles ("GAAP").

GAAP " 'encompass[ ] the conventions, rules, and procedures that define accepted accounting practice at a particular point in time.' " *Shalala v. Guernsey Mem'l Hosp.,* 514 U.S. 87, 101, 115 S.Ct. 1232, 131 L.Ed.2d 106 (1995). Foremost among the sources informing GAAP is the Financial Accounting Standards Board ("FASB"), a private organization founded at the recommendation of the American Institute of Certified Public Accountants to establish accounting principles. Statement of Policy on the Establishment and Improvement of Accounting Principles, SEC Release No. AS–150, 1973 WL 149263, at *1 (Dec. 20, 1973). The "principles, standards and practices promulgated by the FASB in its Statements and Interpretations" are considered by the Securities & Exchange Commission "as having substantial authoritative support, and those contrary to such FASB promulgations [are] considered to have no such support." *Id.*

FASB Statement No. 13 addresses the accounting treatment of estimated residual value in leasing transactions and provides that estimated residual value is determined at the inception of the lease (or in some instances, at the renewal of the lease). Fin. Accounting Standards Bd., Statement of Fin. Accounting Standards No. 13 ("FASB 13"), ¶ 17 (2008). This accounting standard further provides that "[a]n upward adjustment of the estimated residual value shall not be made." *Id.*

The Owners argue that the provisions of FASB 13 are applicable only to accounting.

---

**24.** Under New York law, "[a]n 'ambiguous' word or phrase is one capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Walk–In Med. Ctrs., Inc. v. Breuer Capital Corp.,* 818 F.2d 260, 263 (2d Cir.1987) (quoting *Eskimo Pie Corp. v. Whitelawn Dairies, Inc.,* 284 F.Supp. 987, 994 (S.D.N.Y.1968)).

For example, paragraph 43 of FASB 13 describes generally accepted accounting principles concerning the method by which a lessor in a leveraged lease accounts for that investment. The calculation of the lessor's investment includes the estimated residual value of the leased asset. FASB 13 ¶ 43(c). Except in circumstances not presented here, however, "[t]he estimated residual value shall not exceed the amount estimated at the inception of the lease." *Id.* The same restriction applies to the accounting of a lessor's investment in a "sales-type lease" and a "direct financing lease." *See* FASB 13 ¶¶ 17(a), (d); 18(a), (d). According to the Owners, these restrictions imply that the estimated residual value can increase, but simply prevent the lessor from recognizing a gain on the investment before it actually receives the money.

This argument ignores the distinction between *estimated* residual value and *actual* residual value. Significantly, the parties entered the Participation Agreement with the express understanding that estimated residual value and actual residual value are not the same. Moreover, the parties agreed in section 8.03(b) of the Participation Agreement that Rowan did not guarantee the actual residual value of the Vessel.[25] Thus, Rowan correctly asserts that the "$13,300,000 figure remains the number that should be used in the formula for calculating what Rowan owes."

By setting a time limit for invoking the Appraisal Procedure, the parties have allocated the risk of market fluctuations. If the Owners believed that the estimated residual value of the vessel would increase over time, they could have invoked the Appraisal Procedure at the outset of the contract. By failing to do so, they bore the risk that they would lose value if the estimated residual value rose. This is consistent with economic reality: if the vessel remained in existence at the end of the lease so that its actual residual value could be realized, then the Owners would bear the loss if its actual value was less than estimated and would reap the gain if its value increased. Conversely, if Rowan believed that the rig's estimated residual value would be less than $13.3 million, it could have invoked the Appraisal Procedure. By failing to do so, it bore the risk that it might pay more than the rig's residual value in the event of a loss, but it obtained the benefit of a locking in a "ceiling" for the vessel's stipulated loss value.[26]

We conclude that the previously agreed-upon estimated residual value of $13.3 million was not changed by the Owners' invalid invocation of the Appraisal Procedure after the loss. Even if the 2000 amendment to the Operative Documents contem-

---

**25.** We note also that, in a leveraged lease, the lessee does not guarantee the residual value of the property. FASB 13. This is not simply a matter of accounting, but has a real effect on the terms of the agreement that are consistent with its purpose of establishing a leveraged lease.

**26.** In their motion for rehearing, the Owners argue that " '[b]y delaying the implementation of the appraisal procedure, both parties took the risk that the property would change in value by the time the appraisal finally took place.' " *De Anza Enters. v. Johnson*, 104 Cal.App.4th 1307, 128 Cal.Rptr.2d 749, 757 (2002). The Owners further contend that "Texas public policy requires the *De Anza* approach here to effectuate the parties' agreement to resolve their dispute via the Appraisal Procedure." We note that the contract at issue here, however, is governed by general federal maritime law, whereas *De Anza* is a California state law case using California statutes governing contract interpretation. Those statutes differ from the general federal maritime law that govern this action. Moreover, *De Anza* supports the position that by delaying implementation of the appraisal procedure, the Owners took the risk that the rig would be valueless at the time of the appraisal.

plated a second "Appraisal Procedure," the intention of the parties as expressed in section 18(a) does not encompass a post-casualty appraisal. At most, the parties indicated that the appraisal be performed at the start of the Renewal Term as part of the process of determining the length of the Renewal Term. Nothing in the Operative Documents allows backdating of estimated residual value as the Owners suggest. Although the Owners further argue that they agreed to use the Appraisal Procedure to calculate estimated residual value "if and when there was a need to calculate SLV during the Renewal Term," the need to calculate Stipulated Loss Value was not a mere contingency; rather, it was necessary to calculate Stipulated Loss Value from the start of each term in order for Rowan to ascertain its insurance obligations. Moreover, under the Owners' model, it cannot be determined if or when Rowan breached the contract by under-insuring.

## C. Calculation of Amount Owed by Rowan

The amount Rowan owed in the Event of Loss is set forth in Section 12(a) of the Charter: on the next succeeding Hire Payment Date 60 days after the Loss, Rowan was required to pay to Wilmington, as the Owner Trustee, an amount equal to the sum of the Basic Hire due on that date and Stipulated Loss Value. Stipulated Loss Value on a given payment date is defined to equal the Basic Hire due on that date plus the present value of all remaining payments, plus the present value of the estimated residual value.

On appeal, Rowan challenged only substitution of the estimated residual value of over $80 million as calculated by the Owners rather than the previously agreed-upon estimated residual value of $13.3. million. We agree that the trial court erred in substituting the post-loss figure suggested by the Owners rather than the previously agreed-upon figure; however, we are unable to simply render judgment. *See* Tex. R.App. P. 43.3(a) ("When reversing a trial court's judgment, the court must render the judgment that the trial court should have rendered, except when … a remand is necessary for further proceedings. . . ."). Because the trial court concluded that the insurance proceeds that Rowan deposited in an escrow account were insufficient to meet Rowan's obligations to the Owners, it did not reach the question of the proper disposition of excess insurance funds.

## D. Excess Insurance Proceeds

Insurance proceeds in excess of the amount that Rowan is required to pay pursuant to Section 12(b)(i) of the contract are to be divided between parties "as their interests may appear," but the Operative Documents provide no description of the means by which the parties' interests are to be determined. We therefore remand the question of the method intended by the parties to be used in making this determination, for calculation of the total amount Rowan is required to pay to Wilmington, and for determination of the parties' respective rights to excess insurance proceeds.[27]

---

**27.** Pursuant to Charter section 12, Rowan sought an award of excess insurance proceeds, but the Owners did not seek judgment on this basis. To the contrary, in their motion for summary judgment, they argued as follows:

> With respect to the Halifax, of course, there are no "excess" insurance proceeds subject to Charter § 12(b)(ii) because Rowan's payment obligation under § 12(a) far exceeded

the amount of insurance proceeds received. The owners ask the Court to declare that the Owner Trustee is entitled to *all* of the Halifax insurance proceeds, pursuant to Charter § 12(b)(i).

The Owners argue that, on remand, it is appropriate to consider the Owners' claim that Rowan breached the contract by failing to maintain adequate insurance. We disagree. In its motion for summary judgment, the

Although the Owners argue on appeal that "Rowan had no evidence of any insurable interest of its own in the Halifax hull and equipment," the Owners did not pursue a no-evidence summary judgment or argue that there was no such evidence. In their traditional motion for summary judgment, the Owners merely asserted that "Rowan has *refused to identify* any insurable interest of its own in the Halifax hull and equipment." The Owners do not contend that Rowan lacked an insurable interest, or even lacked evidence of an insurable interest, and the foregoing is not properly characterized as an express ground for traditional or no-evidence summary judgment

## E. Attorneys' Fees

Attorneys' fees were awarded pursuant to the parties' stipulation that appellees' reasonable and necessary attorney fees for the breach-of-contract action total $500,000. Rowan did not challenge this award in its appellate brief, or assert error regarding the amount of fees at any time prior to its reply brief. Although Rowan reserved the right to challenge appellees' entitlement to attorneys' fees, it did not reserve the right to challenge the amount.

On appeal, Rowan cites *Barker v. Eckman* as authority for reversing and re-

manding the attorneys' fee award. 213 S.W.3d 306, 312–15 (Tex.2006). In *Barker,* the Texas Supreme Court concluded that the appellate court could not conduct a proper factual sufficiency review because the jury's award of attorneys' fee was tied to an inflated damage finding. *Id.* at 314–15. Here, however, the parties have stipulated to the proper amount of the Owners' attorneys' fees. Under these circumstances, we are reasonably certain that the trial court's award of attorneys' fees was not significantly influenced by the erroneous amount of damages it considered, but was instead a result of the parties' stipulation. Because we conclude that the Owners correctly asserted that Rowan owed additional funds, albeit in a much lesser amount, we affirm the trial court's award of attorneys' fees.

## VI. Conclusion

Pursuant to the unambiguous terms of the Operative Documents, the Owners were not entitled to recalculation of the estimated residual value based on a post-loss appraisal. We therefore reverse the trial court's judgment and remand for determination of (1) the amount owed by Rowan based upon the Halifax's estimated residual value of $13.3 million, (2) the dis-

Owners asked that the trial court *declare* "that Rowan was obligated to maintain hull insurance on the Halifax ... in an amount sufficient to pay the full value of Defendants' ownership interest...." With regard to the Halifax, the Owners did not move for damages on this basis. As previously noted, however, the trial court severed a number of claims regarding the Halifax from the case before us, including, *inter alia,* the Owners' claims for (1) failure to indemnify the Owners for the Halifax's loss, (2) relief pursuant to pursuant to section 16(b) of the Charter; (3) a declaration of the Owners' right to remedies under section 16(b) of the Charter; and (4) *all relief requested in the Owners' pleadings relating to such claims. See ante,* n. 9 (emphasis added). Section 16(b) of the Charter sets

forth the contractual remedies available should an "Event of Default" occur, and the Charter specifically defines the failure to maintain insurance in compliance with the Charter as an Event of Default. Thus, the Owners' request for a declaration that they are entitled to the remedies under section 16(b) of the Charter is, in effect, a request that the trial court declare whether an Event of Default occurred. Because we read this request for relief to be encompassed in the trial court's reference to "relief requested in the Owners' pleadings relating to" the severed claims described above, we consider the Owners' request for declaratory judgment to be severed as well. Thus, remand for litigation of the claim in the present cause number is unnecessary.

position of excess insurance funds, and (3) applicable pre-judgment and post-judgment interest based upon the corrected amounts. Because the amount of attorneys' fees to be awarded was based upon the parties' stipulation, we affirm the award of attorneys' fees.

FROST, J., dissenting.

## APPENDIX

The key provisions of the Participation Agreement are as follows:

Article III CONDITIONS PRECEDENT

SECTION 3.01. *Conditions Precedent to Participations in Owner's Cost.* The obligation of each Participant on the Closing Date to participate in the payment of Owner's Cost shall be subject to the fulfillment to the satisfaction of, or waiver by, each Participant prior to or on the Closing Date, of the following conditions precedent . . . :

. . .

(j) *Appraisers' Certificates.* The Owner Participant shall have received . . . appraisals by Rush Johnson Associates and [L]owell [J]ohnston & [A]ssociates, [I]nc., in form and substance satisfactory to the Owner Participant . . . and dated the Closing Date, stating in each case:

(i) such appraiser's estimate of the fair market value of the Vessel on the Closing Date, which fair market value shall be equal to $66,500,000;

(ii) such appraiser's estimate as of the Closing Date of the remaining useful life of the Vessel and the residual value thereof at the end of the Basic Term (without taking into account the effects of inflation or deflation and costs of removal to the Owner Participant or the Owner Trustee), which estimates shall be

not less than 22 years and not less than 20% of Owner's Cost for the Vessel, respectively; and

(iii) that the Vessel does not constitute "limited use property" as that term is used in Rev. Proc. 76–30.

SECTION 3.02. *Conditions Precedent to Obligations of Charterer.* The obligations of the Charterer to sell the Vessel to the Owner Trustee, and to charter the Vessel from the Owner Trustee on the Closing Date and to carry out its other obligations under the Operative Documents . . . shall be subject to the performance by each of the other parties hereto of their respective obligations hereunder . . . and the fulfillment to the satisfaction of, or waiver by, the Charterer on or prior to the Closing Date, of the following additional conditions precedent:

. . .

(c) *Other Documents.* The Owner Participant shall have received the appraisals referred to in Section 3.01(j) . . .

SECTION 8.03. *Representations, Warranties and Covenants of the Charterer.* The Charterer represents to, and warrants and covenants for the benefit of, the Owner Participant that:

. . .

(b) *Useful Life, etc.* (i) The period consisting of the Interim Term and the Basic Term is not greater than 80% of the estimated remaining useful life of the Vessel (measured from the Closing Date), (ii) the estimated fair market value of the Vessel at the expiration of the Basic Term is equal to at least 20% of Owner's Cost, without including in such value any increase or decrease for inflation or deflation and after subtracting from such value any estimated cost to the Owner Trustee or the Owner Participant for removal

and delivery of possession of the Vessel to the Owner Participant at the end of such period, (iii) it is reasonable to expect that the Vessel will be useful and usable by a party other than the Charterer or any person related to the Charterer at the end of the Basic Term and any Renewal Term and capable of continued leasing or transfer to another party at that time and that it will be commercially feasible to do so such that the Vessel is not and will not be "limited use property" within the meaning of Revenue Procedure 76–30 as modified to the Closing Date, (iv) Owner's Cost is equal to the fair market value of the Vessel on the Closing Date and (v) the estimated remaining useful life of the Vessel (measured from the Closing Date) is 22 years; *provided, however,* that nothing contained in this Section 8.03(b) shall constitute a guarantee of the actual useful life or residual value of the Vessel.[28]

Article IX RECOMPUTATION OF BASIC RENT, STIPULATED LOSS VALUE AND TERMINATION VALUE

SECTION 9.02. *Stipulated Loss Value; Termination Value.* At the time any adjustment of Basic Hire percentages shall be required under this Article IX or under Section 8.09, the Stipulated Loss Value and Termination Value percentages specified in Schedules A and B annexed to the Charter shall be adjusted by the Owner Participant, effective as of the first Hire Payment Date thereafter; *provided, however,* that Stipulated Loss Value and Termination Value percentages shall not be reduced below those percentages that will produce Stipulated Loss Value or Termination Value as of any Hire Payment Date until expiration of the Basic Term (taken together with any Interim Hire or Basic Hire payable on such Hire Payment Date) at least equal to the principal amount of, and interest on the Bonds outstanding on the Hire Payment Date to which such payment of Stipulated Loss Value or Termination Value, as the case may be, relates.

SECTION 9.03. *Computation of Adjustments.* Upon the occurrence of an event requiring an adjustment to any Basic Hire, Stipulated Loss Value or Termination Value percentages pursuant to this Article IX or under Section 8.08,[29] the Owner Participant shall make the necessary computations and, within 90 days of the Owner Participant's knowledge of such event, furnish to the Charterer (with a copy to the Indenture Trustee) a certificate of the Owner Participant setting forth the amount of any increase or decrease in such percentages and the computation of such amounts. If the Charterer shall disagree with any

---

28. In section 3.01(j) of the Participation Agreement, it is similarly stated that it is a condition precedent which must be fulfilled or waived that, as of the Closing Date, the Owner Participant shall have received appraisals by Rush Johnson Associates and Lowell Johnston & Associates, Inc., "(i) such appraiser's estimate of the fair market value of the Vessel on the Closing Date, which ... shall be equal to $66,500,000; (ii) such appraiser's estimate as of the Closing date of the remaining useful life of the Vessel and the residual value thereof at the end of the Basic Term ..., which estimates shall be not less than 22 years and not less than 20% of Owner's Cost for the Vessel, respectively...."

29. Section 8.08 concerns changes in tax law. Under Section 9.01, adjustments are also required if Transaction Costs are greater or less than 0.75% of Owner's Costs or the Closing Date is other than December 28, 1984. The occurrence of a loss is not included among the events requiring such adjustment.

such amounts, they shall be reviewed and determined by an independent accounting firm jointly chosen by the Owner Participant and the Charterer or, in the absence of agreement as to such firm, by a third independent accounting firm jointly chosen by two independent accounting firms, one chosen by the Owner Participant and one chosen by the Charterer. The costs of such verification shall be borne by the Charterer.

Appendix A DEFINITIONS RELATING TO THE PARTICIPATION AGREEMENT, CHARTER, INDENTURE AND TRUST AGREEMENT REFERRED TO BELOW

*"Appraisal Procedure"* shall mean the procedure specified in the succeeding sentences for determining an amount, value or period. If the Owner Trustee and the Charterer shall have been unable to agree on such amount, value or period, and if either the Owner Trustee or the Charterer shall give written notice to the other requesting determination of such amount, value or period by appraisal, the Owner Trustee and the Charterer shall consult for the purpose of appointing a mutually acceptable qualified independent appraiser, who shall be a marine surveyor. If such parties shall be unable to agree on an appraiser within 20 days of the giving of such notice, such amount or value shall be determined by a panel of three independent appraisers, each of whom shall be a marine surveyor. One of such appraisers shall be selected by the Charterer and another shall be selected by the Owner Trustee; *provided, however,* that if either the Charterer or the Owner Trustee shall fail to select an appraiser within 30 days after the giving of such notice, such appraiser shall be selected by the other party. The two appraisers selected as aforesaid shall select the third appraiser or, if they shall be unable to agree on a third appraiser within 10 days after each of such two appraisers shall have been selected, such third appraiser shall be selected by the American Arbitration Association (or its successors). The appraiser or appraisers appointed pursuant to the foregoing procedure shall be instructed to determine such amount, value or period within 45 days after such appointment and such determination shall be final and binding upon the parties. If three appraisers shall be appointed, the determination of the appraiser that shall differ most from the second highest determination of all three appraisers shall be excluded, the remaining two determinations shall be averaged and such average shall constitute the determination of the appraisers. The fees and expenses of the appraiser appointed by the Charterer shall be paid by the Charterer, the fees and expenses of the appraiser appointed by the Owner Trustee shall be paid by the Owner Trustee and the fees and expenses of the third appraiser shall be divided equally between the Charterer and the Owner Trustee, except that all fees and expenses of all the appraisers shall be paid by the Charterer in the case of an appraisal or determination under Section 16 of the Charter.

*"Event of Loss"* shall mean any of the following events:

. . .

(d) the loss or disappearance of the Vessel, whether or not covered by insurance. . . .

*"Fair Market Sales Value"* shall mean, as to the Vessel or any other property, the fair market sales value thereof that would be obtained in an arm's-length transaction between an informed and willing buyer and an in-

formed and willing seller, under no compulsion, respectively, to buy or sell.

"*Hire Payment Dates*" (a) for the Interim Term shall mean the first day of the Basic term, (b) for the Basic Term shall mean the six-month anniversaries of the commencement of the Basic Term occurring in March and September of each year after commencement of the Basic Term and (c) for any Renewal Term shall mean the sixth-month anniversary of the first day of such Renewal Term, each sixth-month anniversary thereafter during such Renewal Term and, if not such an anniversary, the last day of such Renewal Term.

"*Interim Hire*" shall mean the charter hire payable pursuant to Section 4(b) of the Charter.

"*Interim Term*" shall mean the period commencing on the Closing Date and ending on March 14, 1985, or such shorter period as may result from earlier termination of the Charter as provided herein.

"*Owner Participant*" shall mean Textron Financial Corporation, a Delaware corporation, and shall also include any Person to which such corporation (or any successor) shall transfer its right, title and interest in and to the Vessel and the Operative Documents in accordance with Section 11.01 of the Participation Agreement.

"*Owner's Cost*" shall mean $66,500,000.

"*Renewal Term*" shall mean each of the periods after the end of the Basic Term with respect to which the Charterer shall exercise its option to renew the Charter pursuant to Section 18 of the Charter, or such shorter period as may result from the termination of the Charter as provided herein.

"*Stipulated Loss Value*" as of any date during the Interim Term or the Basic Term shall mean an amount equal to the product of [the] Owner's Cost multiplied by the percentage set forth in Schedule A to the Charter opposite the applicable Hire Payment Date specified therein. "*Stipulated Loss Value*" as of any date during any Renewal Term shall mean the amount determined pursuant to Section 18 of the Charter. Stipulated Loss Value shall be adjusted as required in Article IX of the Participation Agreement. Notwithstanding anything in the Charter (including Schedule A thereto) or in any other Operative Document to the contrary, Stipulated Loss Value as of any Hire Payment Date shall be, under any circumstances and in any event, in a sum at least sufficient, together with the Interim Hire or Basic Hire payable on such Hire Payment Date, to pay an amount equal to the principal of and interest on all Bonds then outstanding.

"*Supplemental Hire*" shall mean any and all amounts, liabilities and obligations other than Interim Hire or Basic Hire that the Charterer assumes or agrees to pay under any Operative Document, including, without limitation, payments of Stipulated Loss Value, Fair Market Sales Value and Termination Value and any damages for breach of any covenants, representations, warranties or agreements therein, to any Participant, the Owner Trustee or the Indenture Trustee.

## B. The Bareboat Charter

As an Owner Participant under the Participation Agreement, Textron executed a Trust Agreement with Wilmington. Rowan transferred title to the rig to Wilmington using a written bill of sale, then chartered the rig from Wilmington pursuant to a Bareboat Charter dated December 1,

1984. The key provisions of the Bareboat Charter are as follows:

SECTION 6. Amended by Assumption & Assignment of Participation Agreement, July 14, 2000.

SECTION 7. *Operations and Maintenance; Compliance with Law; Alterations, Modifications and Additions.* (a) *Operation and Maintenance.* The Charterer shall have full responsibility for possession, use, operation, maintenance and repair of the Vessel throughout the Charter Term and until redelivery thereof. Except during such period as (y)[sic] an Event of Loss shall have occurred and be continuing, or (z) [sic] there has been any other loss or damage with respect to the Vessel and the Charterer shall not have had a reasonable time to repair the same (the Charterer hereby agreeing to diligently repair the same), the Charterer shall, at its own cost and expense (whether or not any applicable insurance proceeds are adequate for the purpose); (i) maintain and preserve the Vessel and her drilling and other equipment in good running order and repair, so that the Vessel shall be, insofar as due diligence can make her so, tight, staunch, strong and well and sufficiently tackled, separated, furnished, equipped and in every respect seaworthy and in as good operating condition as when delivered hereunder, ordinary wear and tear excepted, and in any event in the condition, running order and repair which equals or exceeds in-

dustry standards and the condition, running order and repair of other vessels and rigs and their equipment owned or leased by the Charterer of like kind and age, (ii) keep the Vessel in such condition as will entitle her to the highest classification and rating by the American Bureau of Shipping for vessels of the same age, type and use, (iii) cause the Vessel to meet all requirements of Applicable Laws ... (iv) cause the Vessel to be overhauled when necessary or appropriate and to be dry-docked, cleaned and bottom-painted when necessary ..., and (v) maintain the Vessel as required by manufacturers' warranties and outstanding insurance policies.

SECTION 8. DELETED BY ASSUMPTION & ASSIGNMENT OF PARTICIPATION AGREEMENT, July 14, 2000

SECTION 9. *Insurance.* (a) *Insurance Against Loss or Damage to the Vessel.* The Charterer shall maintain in effect, at its own expense, "all-risk" hull insurance covering the Vessel, in an aggregate amount of not less than the greater of (i) the Stipulated Loss Value as of the last preceding Basic Hire Payment Date (or during the period from and including the Closing Date [30] to and including the first Basic Hire Date, as of the first Basic Hire Payment Date) (the "SLV Amount") and (ii) such amount as shall be sufficient to prevent the Charterer, the Owner Trustee, the Indenture Trustee,[31] any Participant or any Holder from being a coinsurer of any loss under the applicable insurance policies,[32] with deductibles not in excess of

---

**30.** The Closing Date is defined to mean December 28, 1984.

**31.** The Participation Agreement names "The Connecticut Bank and Trust Company, National Association" as Indenture Trustee. Rowan Companies, Inc. is named as Charterer, and the remaining originally-named parties to the Participation Agreement are six Bond Purchasers.

**32.** At the summary judgment hearing, Rowan's attorney emphasized the word, "applicable":

Mr. Beck: It doesn't say under any insurance. It says "the applicable[.]" They knew what the applicable insurance policy was. They knew it was an agreed value policy. They knew that it was not a co-insurance situation. And over 16 years of the basic term they never com-

$500,000. Such insurance shall cover marine perils (but need not cover war risk except as set forth in Section 9(j)) on hull and machinery, and the policy or policies of insurance shall be placed through independent brokers of good standing and shall be issued by responsible underwriters reasonably acceptable to the Owner Participant, shall be maintained in the broadest forms available in either the American or British insurance markets, shall otherwise contain conditions, terms; stipulations and insurance covenants reasonably satisfactory to the Owner Participant, and shall be kept in full force and effect by the Charterer at all times during the Charter Term; *provided* that, so long as the Charterer's Stockholders' Equity is at least $400,000,000, the Charterer may self-insure up to the excess of the SLV Amount over $55,000,000; and *provided further, however,* that unless and until an Event of Loss shall occur with respect to the Vessel, the Charterer shall promptly and fully repair all damage to the Vessel and shall pay all salvage and other charges with respect to such damage, whether or not any insurance is maintained by the Charterer with re-

spect to the loss resulting from such damage. The Charterer shall not put into effect or materially change any such self-insurance arrangement unless it shall have notified the Owner Trustee, the Indenture Trustee and each Participant of the details of such arrangement or change and the Charterer shall have furnished to the Owner Participant and the Indenture Trustee such evidence as shall be reasonably satisfactory to the Owner Participant and the Indenture Trustee that such arrangement or change shall not result in any coinsurance penalty.

. . .

(k) *Additional Insurance.* The Owner Trustee, the Owner Participant or the Indenture Trustee may, at its expense, obtain any additional insurance covering the Vessel or covering any interests of the Owner Trustee, the Indenture Trustee or any Participant, as the case may be, with respect to the Vessel as it may in its discretion deem appropriate; *provided* that no such Person shall purchase any such insurance that would void, impair or reduce the coverages of the insurance required to be maintained by the Charterer pursuant to this Sec-

---

plained about any of this.... They didn't complain about any of that and now they're coming in after the fact, we respectfully submit, and say, no, that's not really the procedure you should have been following.

He later explained that this shows the dealings and course of conduct of the parties. Rowan's attorney also asserted that the Owner Trustee purchased "gap insurance" for the difference between the "agreed value" coverage Rowan bought and the Owner Trustee's claimed interest. The trial court pointed out that section 9(a) requires Rowan to insure "the greater of" SLV or an amount necessary to prevent any party (the Charterer, Owner Trustee, etc.) from being a coinsurer. In response, Rowan's attorney insisted that "you

cannot ignore the language under the applicable insurance policies." The trial court also pointed out that the charter does not say that Rowan has an obligation to maintain agreed value insurance, and Rowan's counsel answered, "No, but it's in the certificate that tells them the type of all risk hull insurance that we bought. And it tells them specifically what the amount is. Our position was consistently throughout the 16–year term of the charter that that was the amount of the policy 9(a) required us to get. And nobody ever complained about that." But Textron says that Jane M. Lavoie's letter of August 15, 2005 to Rowan's treasurer and vice-president of finance is evidence that they did question the adequacy of the insurance.

tion 9. Any such insurance shall not be governed by any other provision of this Charter, the Indenture or the Mortgage, including without limitation as to policy provisions and payment of proceeds.

SECTION 12. *Loss, Destruction, Condemnation or Damage.* (a) *Payment of Stipulated Loss Value.* Upon the occurrence of an Event of Loss with respect to the Vessel, the Charterer shall forthwith (and, in any event, within five Business Days of such occurrence) give the Owner Trustee and the Indenture Trustee notice of such Event of Loss and, on the next succeeding Hire Payment Date 60 days after such occurrence (or, if earlier, the final scheduled Hire Payment Date) pay to the Indenture Trustee so long as the Indenture is in effect and thereafter to the Owner Trustee an amount equal to the sum of (i) Stipulated Loss Value calculated as of such Hire Payment Date, (ii) Interim Hire or Basic Hire due and payable on such Hire Payment Date and (iii) any other Hire then due and payable. Nothing in this Section 12 shall relieve the Charterer from its obligation to pay Interim Hire or Basic Hire on any Hire Payment Date occurring prior to or on the date on which Stipulated Loss Value shall be payable.

Upon payment in full of all amounts due pursuant to the preceding paragraph and provided no Charter Default shall have occurred and be continuing, the Owner Trustee shall transfer (without any representation, warranty or recourse whatsoever except the absence of Owner's Liens) the Vessel to the Charterer by instruments reasonably satisfactory in form and substance to the Charterer, the obligation of the Charterer to pay Interim Hire and Basic Hire shall terminate, the Vessel shall no long-er be subject to this Charter and the Charter Term shall end.

(b) *Application of Payments upon an Event of Loss.* Subject to the provisions of Section 12(d), any payments received at any time by the Owner Trustee or by the Charterer with respect to the Vessel (including insurance proceeds from insurance carried by the Charterer) from any governmental authority or other Person as a result of the occurrence of an Event of Loss shall be applied as follows:

(i) so much of such payments as shall not exceed all amounts required to be paid by the Charterer pursuant to Section 12(a)(i) or (ii) shall, for so long as the Indenture shall be in effect, be paid to the Indenture Trustee (or, if the Indenture shall not be in effect, to the Owner Trustee) and, to the extent so paid, shall be a credit against (or, if the Indenture shall not be in effect, be applied in reduction of) the Charterer's obligation to pay such amounts if not already paid by the Charterer, or if already paid by the Charterer, shall be applied to reimburse the Charterer for its payment of such amounts, and (ii) the balance, if any, of such payments remaining thereafter, shall be divided between the Owner Trustee and the Charterer as their interests may appear.

Upon payment in full of all amounts due pursuant to Section 12(a) and provided no Charter Default shall have occurred and be continuing, the Charterer shall, to the extent of its payment pursuant to Section 12(a)(i), be subrogated to any rights of the Owner Trustee arising solely out of such Event of Loss.

SECTION 15. *Charter Events of Default.* The following events shall constitute Charter Events of Default (whether

any such event shall be voluntary or involuntary or come about or be effected by operation of law or pursuant to or in compliance with any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body:

(a) the Charterer shall fail to make any payment of Interim Hire, Basic Hire, Termination Value or Stipulated Loss Value within the earlier of

 (i) five days after the same shall have become due or

 (ii) two days after written notice by personal delivery, telex or other written communication . . .; or

(b) the Charterer shall fail to make any other payment of Supplemental Hire. . . .

(c) the Charterer shall fail to carry and maintain insurance on or with respect to the Vessel in compliance with the provisions of Section 9 hereof, or shall otherwise fail to comply with its obligations set forth in Section 9(i) hereof. . . .

SECTION 16. *Remedies.* Upon the occurrence of any Event of Default and at any time thereafter so long as the same shall be continuing, the Owner Trustee may, at its option, by notice to the Charterer . . ., declare this Charter to be in default, and at any time thereafter the Owner Trustee may do one or more of the following as the Owner Trustee in its sole discretion shall elect, to the extent permitted by, and subject to compliance with the mandatory requirements of, all Applicable Laws then in effect:

. . .

(b) the Owner Trustee, by notice to the Charterer specifying a payment date not earlier than ten days nor more than 30 days from the date of such notice, may require the Charterer to pay to the Owner Trustee, and the Charterer hereby agrees that it will pay to the Owner Trustee, on the payment date specified in such notice, as liquidated damages for loss of a bargain, and not as a penalty, and in lieu of any further payments of Basic Hire hereunder, an amount (reduced by any amounts previously paid by the Charterer pursuant to Section 16(d)) equal to the sum of (i) all unpaid Basic Hire payable or that would have been payable on or before the Hire Payment Date next succeeding the date of payment specified in such notice, plus (ii) an amount equal to Stipulated Loss Value calculated as of such Hire Payment Date, unless such payment date shall occur on a Hire Payment Date, in which case Stipulated Loss Value and unpaid Basic Hire shall be computed as of such Hire Payment Date, together with interest, if any, at the Overdue Rate on the amount of such Stipulated Loss Value and Basic Hire from the Hire Payment Date as of which Stipulated Loss Value is computed until the date of actual payment; and upon such payment of liquidated damages and all other Hire then due and payable by the Charterer the Owner Trustee shall transfer (without any representation, recourse or warranty whatsoever other than the absence of Owner's Liens) the Vessel to the Charterer and the Owner Trustee shall execute and deliver such documents evidencing such transfer and take such further action as the Charterer shall reasonably request. In addition, the Owner Trustee may, within 30 days after the Charterer shall make the full payment of Basic Hire and Stipulated Loss Value as aforesaid, give the Charterer written notice requesting that the Fair Market Sales Value of the Vessel

as of the date as of which Stipulated Loss Value was determined pursuant to clause (ii) of this Section 16(b) be determined. If the Fair Market Sales Value of the Vessel as of such date shall be determined to exceed the Stipulated Loss Value paid pursuant to the first sentence of 16(b), the Charterer shall, within 60 days after such determination, pay the amount of such excess to the Owner Trustee.

. . .

(d) Whether or not the Owner Trustee shall have exercised, or shall thereafter at any time exercise, any of its rights under Section 16(c) (other than a sale under Section 16(c)), the Owner Trustee may, at any time prior to the time that the Vessel shall have been transferred to the Charterer pursuant to Section 16(b) or sold by the Owner Trustee pursuant to Section 16(c), by written notice to the Charterer requesting that the Fair Market Sales Value or Fair Market Rental Value of the Vessel be determined, demand that the Charterer shall pay to the Owner Trustee, and the Charterer shall pay to the Owner Trustee on the first Hire Payment Date occurring at least ten days after the determination of such Fair Market Sales Value or Fair Market Rental Value, as the case may be, as liquidated damages for loss of a bargain and not as a penalty (in lieu of all payments of Basic Hire becoming due after the payment date), an amount equal to the sum of (i) all unpaid Basic Hire due on or before such Hire Payment Date and (ii) whichever of the following amounts the Owner Trustee, in its sole discretion, shall specify in such notice (together with interest on such amount at the Overdue Rate from the scheduled payment date to the date of actual payment): (x) [sic] an amount equal to the excess, if any, of the Stipulated Loss Value, computed as of such Hire Payment Date, over the Fair Market Rental Value of the Vessel for the remainder of the Basic Term or the then[-]current Renewal Term, as the case may be, after discounting such Fair Market Rental Value semi-annually (effective on the Hire Payment Dates) to present worth as of the scheduled payment date at the rate of interest borne by the Bonds at the time outstanding or if none shall be outstanding, the Prime Rate, or (y) [sic] an amount equal to the excess, if any, of the Stipulated Loss Value for the Vessel as of such Hire Payment Date over the Fair Market Sales Value of the Vessel.

All determinations of Fair Market Sales Value and Fair Market Rental Value pursuant to this Section 16 shall be determined in accordance with the Appraisal Procedure. No termination of this Charter, in whole or in part, or exercise of any remedy under this Section 16 shall, except as specifically provided herein, relieve the Charterer of any of its liabilities and obligations hereunder, all of which shall survive such termination, repossession or exercise or remedy. In addition, the Charterer shall be liable for any and all unpaid Supplemental Hire due hereunder (and all other amounts payable by Charterer under the Participation Agreement) before, after or during the exercise of any of the foregoing remedies, including all reasonable legal fees and other costs and expenses incurred by the Owner Trustee . . . by reason of the occurrence of any Charter Event of Default or the exercise of the remedies of the Owner Trustee with respect thereto. . . .

To the extent permitted by, and subject to the mandatory requirements of all Applicable Laws, each and every right, power and remedy herein specifically given to the Owner Trustee or otherwise in this Charter shall be cumulative and shall be in addition to every other right, power and remedy herein specifically given or now or hereafter existing at law, in admiralty, in equity or by statute, and each and every right, power and remedy whether specifically given herein or otherwise existing may be exercised from time to time and as often and in such order as may be deemed expedient by the Owner Trustee, and the exercise or the beginning of the exercise of any power or remedy shall not be construed to be a waiver of the right to exercise at the same time or thereafter any other right, power or remedy. No delay or omission by the Owner Trustee in the exercise of any right, power or remedy or in the pursuit of any remedy shall impair any such right, power or remedy or be construed to be a waiver of any default on the part of the Charterer or to be an acquiescence therein. No express or implied waiver by the Owner Trustee of any Event of Default shall in any way be, or be construed to be, a waiver of any future or subsequent Charter Event of Default. . . .

. . .

SECTION 18 *Renewal Options.* (a) *Fixed Rental Renewal Option.* Unless the Charterer shall have elected to purchase the Vessel under Section 19, and unless a Charter Default shall have occurred and then be continuing, the Charterer may, by irrevocable written notice to the Owner Trustee given not less than twelve months nor more than 18 months prior to the scheduled expiration of the Basic Term, renew this Char-

ter at the expiration of the Basic Term. Such Renewal Term shall be for a period that, when added to the Interim Term and the Basic Term, shall not exceed 80% of the total estimated remaining economic useful life of the Vessel (measured from the Closing Date) as determined by the Appraisal Procedure and in no case shall exceed 7-1/2 years; *provided, however,* that (A) at the end of such Renewal Term the Vessel will have an estimated residual value (in 1984 dollars without giving effect to inflation or deflation from the beginning of the Charter Term) as determined in such Appraisal Procedure of not less than 20% of the Owner's Cost for the Vessel and (B) the use of the Vessel will, as of the beginning of such Renewal Term and as determined in such Appraisal Procedure, be reasonably expected to be commercially feasible (in a manner that would permit the Owner Trustee to realize the residual value described in the foregoing clause (A)) by some Person other than the Charterer (or any party related to the Charterer) who could charter or purchase the Vessel from the Owner Trustee at the end of such Renewal Term. In addition to the limitation set forth in the next preceding sentence, no Renewal Term pursuant to this paragraph (a) shall be entered into if it would end before one year after the commencement thereof. During such Renewal Term, all of the provisions of this Charter shall continue in full force and effect, **except** that (i) Basic Hire shall be payable semiannually in arrears in an amount equal to 50% of the weighted average amount of the semiannual installments of Basic Hire payable during the Basic Term and (ii) Stipulated Loss Value on each Hire Payment Date during such Renewal Term shall be equal to the sum of Basic Hire payable on such Date and the present value

as of such Date of (a) Basic Hire that would have been payable over the balance of such Renewal Term and (b) the estimated residual value as of the end of such Renewal Term (present value to be determined by using a discount rate of 10% compounded semiannually) as determined by the Appraisal Procedure.

SECTION 27. *Miscellaneous.* (f) *Governing Law.* This Charter shall in all respects be governed by, and construed in accordance with, the general maritime laws of the United States of America and otherwise by the laws of the State of New York.

KEM THOMPSON FROST, Justice, dissenting.

The construction of the relevant contractual provisions proffered by the owner trustee is the only reasonable construction. Under this construction, the "estimated residual value" part of the definition of "Stipulated Loss Value" during the "Renewal Term" of the charter is determined by an appraisal procedure and is not set at $13.3 million at the beginning of the transaction or at the beginning of the Renewal Term, as contended by the charterer. The owner trustee followed this appraisal procedure, which resulted in a determination that the estimated residual value for the rig as of March 15, 2008, was in excess of $83 million. Though the charterer has asserted that, under its construction of the charter, the appraisal procedure was not available, the charterer has never challenged the

manner in which this appraisal procedure was conducted. The independent appraisers' determination of the estimated residual value through this procedure is final and binding upon the parties. Based on the unambiguous language of the contracts, this court should affirm the trial court's judgment in favor of the owner trustee.

## OVERVIEW OF OPERATIVE AGREEMENTS AND KEY EVENTS

### *Participation Agreement and Charter*

Effective as of December 1, 1984, appellant Rowan Companies, Inc. (hereinafter "Rowan") as Charterer, appellee Textron Financial Corporation (hereinafter "Textron") as Owner Participant,[1] and appellee Wilmington Trust Company (hereinafter "Wilmington Trust") as Owner Trustee entered into the Participation Agreement[2] regarding the Rowan–Halifax 116–C Jack-up Rig (hereinafter "Rowan Halifax"). One of the conditions precedent to the closing of the transaction in December 1984 was that the Owner Participant receive two appraisals, each stating the appraiser's estimate of the remaining useful life of the Rowan Halifax and the residual value thereof at the end of the Basic Term[3] of the charter on September 15, 2000 (without taking into account the effects of inflation or deflation and costs of removal to the Owner Participant or Owner Trustee) in amounts not less than 22 years and $13.3 million, respectively. In the Participation Agreement, Rowan represented and warranted for the benefit of

---

1. At the time of the December 1, 1984 transaction, Textron Financial Corporation was the Owner Participant under the Participation Agreement. Textron later assigned its interest to North Sea Investments, Inc. Because the entity serving as Owner Participant is not relevant to the issues in this appeal, in this opinion reference will be made generically to the "Owner Participant."

2. There were other parties to the Participation Agreement who are not material to the issues at hand.

3. Under the Participation Agreement, the Interim Term of the Charter began on December 28, 1984, and ended on March 14, 1985. The Basic Term of the Charter began on March 15, 1985, and ended on September 15, 2000.

the Owner Participant that the estimated fair market value of the Rowan Halifax at the end of the Basic Term on September 15, 2000, was equal to at least $13.3 million.

Effective as of December 1, 1984, Rowan and Wilmington Trust also entered into a Bareboat Charter of the Rowan Halifax (hereinafter "Charter"). In the Charter, the parties incorporated the definitions contained in Appendix A of the Participation Agreement. Consequently, the parties agreed in pertinent part to the following definitions:

*"Appraisal Procedure"* shall mean the procedure specified in the succeeding sentences for determining an amount, value or period. If the Owner Trustee and the Charterer shall have been unable to agree on such amount, value or period, and if either the Owner Trustee or the Charterer shall give written notice to the other requesting determination of such amount, value or period by appraisal, the Owner Trustee and the Charterer shall consult for the purpose of appointing a mutually acceptable qualified independent appraiser, who shall be a marine surveyor. If such parties shall be unable to agree on an appraiser within 20 days of the giving of such notice, such amount or value shall be determined by a panel of three independent appraisers, each of whom shall be a marine surveyor ... [detailing more procedures] ... The appraiser or appraisers appointed pursuant to the foregoing procedure shall be instructed to determine such amount, value or period within 45 days after such appointment and such determination shall be final and binding upon the parties.

*"Renewal Term"* shall mean each of the periods after the end of the Basic Term [on September 15, 2000] with respect to which [Rowan] shall exercise its option to renew the Charter pursuant to Section 18 of the Charter.

*"Stipulated Loss Value"* as of any date during any Renewal Term shall mean the amount determined pursuant to Section 18 of the Charter.

The focus of this appeal is the proper construction of Section 18(a) of the Charter, which provides in its entirety as follows:

*Fixed Rental Renewal Option.* Unless [Rowan] shall have elected to purchase the [Rowan Halifax] under Section 19, and unless a Charter Default shall have occurred and then be continuing, [Rowan] may, by irrevocable written notice to [Wilmington Trust] given not less than twelve months nor more than 18 months prior to the scheduled expiration of the Basic Term, renew this Charter at the expiration of the Basic Term. Such Renewal Term shall be for a period that, when added to the Interim Term and the Basic Term, shall not exceed 80% of the total estimated remaining economic useful life of the [Rowan Halifax] (measured from the Closing Date [December 28, 1984]) as determined by the Appraisal Procedure and in no case shall exceed 7–1/2 years; *provided, however,* that (A) at the end of such Renewal Term the [Rowan Halifax] will have an estimated residual value (in 1984 dollars without giving effect to inflation or deflation from the beginning of the Charter Term) as determined in such Appraisal Procedure of not less than [$13.3 million] and (B) the use of the [Rowan Halifax] will, as of the beginning of such Renewal Term and as determined in such Appraisal Procedure, be reasonably expected to be commercially feasible (in a manner that would permit [Wilmington Trust] to realize the residual value described in the foregoing clause (A)) by some Person other than [Rowan] (or any party related to [Rowan]) who could charter or purchase the [Rowan Halifax] from [Wilmington Trust] at the end of

such Renewal Term. In addition to the limitation set forth in the next preceding sentence, no Renewal Term pursuant to this paragraph (a) shall be entered into if it would end before one year after the commencement thereof. During such Renewal Term, all of the provisions of this Charter shall continue in full force and effect, except that (i) Basic Hire shall be payable semiannually in arrears in an amount equal to 50% of the weighted average amount of the semiannual installments of Basic Hire payable during the Basic Term and (ii) Stipulated Loss Value on each Hire Payment Date during such Renewal Term shall be equal to the sum of Basic Hire payable on such Date and the present value as of such Date of (a) Basic Hire that would have been payable over the balance of such Renewal Term and (b) the estimated residual value as of the end of such Renewal Term (present value to be determined by using a discount rate of 10% compounded semiannually) as determined by the Appraisal Procedure.

Under the Charter, upon the occurrence of an Event of Loss with respect to the Rowan Halifax, Rowan is required to give Wilmington Trust notice. In addition, as applicable to the undisputed facts of this case, on the next Hire Payment Date sixty days after the loss, Rowan is required to pay to Wilmington Trust, among other things, the "Stipulated Loss Value calculated as of such Hire Payment Date." In the Charter, the parties agreed to a schedule specifying the Stipulated Loss Value during the Basic Term. Under this schedule, Stipulated Loss Value begins at more than $73 million on March 15, 1985, and decreases over time until it is $13.3 million at the end of the Basic Term on September 15, 2000.

4. Unless otherwise stated, all references to a "Section" are to the respective section of the

*Assumption and Assignment of Participation Agreement*

Rowan timely exercised its option to renew the Charter for a Renewal Term that would last 7.5 years after the expiration of the Basic Term. Effective as of July 14, 2000, Rowan, Wilmington Trust, the Owner Participant, and Banc of America Leasing & Capital, LLC, entered into an Assumption and Assignment of Participation Agreement (hereinafter "Assumption Agreement") in which the parties agreed in pertinent part as follows:

● Rowan has renewed the Charter for a Renewal Term that will begin on September 15, 2000 and end on March 15, 2008.

● The Charter is amended so that Stipulated Loss Value payable during this Renewal Term "shall mean the amount determined by the procedure set forth for [sic] Section 18 of the Charter."

● Except as modified in the Assumption Agreement, the Participation Agreement and Charter are ratified and confirmed in all respects.

*Loss of the Rig and the Appraisal Procedure*

In late September 2005, the Rowan Halifax sank during Hurricane Rita. Rowan gave notice of the loss, and under Section 12 of the Charter, Rowan was required to pay Wilmington Trust on March 15, 2006, the Stipulated Loss Value calculated as of March 15, 2006. Under Section 18(a),[4] this Stipulated Loss Value includes "the present value as of such [Hire Payment] Date [March 15, 2006,] of ... the estimated residual value as of [March 15, 2008,] (present value to be determined by using a discount rate of 10% compounded semian-

Charter.

nually) as determined by the Appraisal Procedure."

None of the agreements contains a definition of "estimated residual value" (hereinafter "ERV"). Rowan asserted that the ERV of the Rowan Halifax as of March 15, 2008, was $13.3 million. Wilmington Trust disagreed. Wilmington Trust gave written notice to Rowan that it was invoking the Appraisal Procedure to determine this value. In the entire history of the contractual relationship, this was the only use of the Appraisal Procedure involving the appointment of one or more marine surveyors. Rowan took the position that it was not proper under the contracts in question to use the Appraisal Procedure to determine the ERV following an Event of Loss. Accordingly, Rowan did not participate in the Appraisal Procedure. Nonetheless, Rowan has not disputed that the proper procedures were followed, as detailed in the definition of "Appraisal Procedure" in the Participation Agreement. Under this Appraisal Procedure, using three independent marine surveyors, the ERV for the Rowan Halifax as of March 15, 2008, was determined to be $83,063,250. The trial court based its judgment on this amount being the ERV of the Rowan Halifax as of that date. Rowan asserts that it was inappropriate to use the Appraisal Procedure and that, under the Charter, the ERV of the

Rowan Halifax as of March 15, 2008, was $13.3 million. The main issue in this appeal is which of these constructions is correct.

### ANALYSIS

To ascertain the parties' true intentions, this court must examine the entire agreement in an effort to harmonize and give effect to all provisions of the contract so that none will be rendered meaningless. *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 652 (Tex.1999). Whether a contract is ambiguous is a question of law for the court. *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex.1996). A contract is ambiguous when its meaning is uncertain and doubtful or is reasonably susceptible to more than one interpretation. *Id.* However, when a written contract is worded so that it can be given a certain or definite legal meaning or interpretation, it is unambiguous, and the court construes it as a matter of law.[5]

### *Reasonableness of the Owners' Construction of Section 18*

Rowan and the Owners[6] filed competing declaratory-judgment claims and cross-motions for summary judgment on these claims. The trial court denied Rowan's motion and granted the Owners' motion. By doing so, the trial court impliedly con-

**5.** *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex.2003). The parties to the Participation Agreement chose New York law to govern that agreement. The parties to the Charter chose general maritime law and, to the extent necessary, New York law to govern the Charter. No party has asserted or established that New York law or general maritime law differs from Texas law regarding any issue in this case. Therefore, this court should presume that in all material respects New York law and general maritime law are the same as Texas law. *See Excess Underwriters at Lloyd's, London v. Frank's Casing Crew & Rental Tools, Inc.*, 246 S.W.3d 42, 53 (Tex.2008).

**6.** At the time of the December 1, 1984 transaction, Textron was the Owner Participant under the Participation Agreement. Textron later assigned its interest to North Sea Investments, Inc., who intervened in this case along with North Sea (Connecticut) LP. Since December 1, 1984, Wilmington Trust Company has held title to the Rowan Halifax as Owner Trustee. All of these parties are appellees. Because the distinctions among these parties are not relevant to the issues in this appeal, for simplicity, all of these appellees are collectively referred to in this opinion as "Owners."

cluded that the Owners' proffered construction of Section 18 is the only reasonable construction. *See Heritage Res., Inc.,* 939 S.W.2d at 121. Under the Owners' construction, while the parties agreed to predetermined, fixed amounts for Stipulated Loss Value on the dates on which hire was due throughout the Basic Term, during the Renewal Term, one of the amounts used to calculate Stipulated Loss Value [7] is determined by the Appraisal Procedure. That element is the present value as of March 15, 2006, of the ERV of the Rowan Halifax as of the end of the Renewal Term, March 15, 2008, with the present value determined by using a discount rate of ten percent compounded semiannually. Terms in a contract are given their plain, ordinary and generally accepted meanings unless the contract itself shows the terms to be used in a technical or different sense. *Heritage Res., Inc.,* 939 S.W.2d at 121. Rowan and Wilmington Trust could not agree on this value. Following the Appraisal Procedure and based on the determinations of three independent marine surveyors, this value was determined to be $83,063,250.

Rowan argues that the Owners' construction makes it impossible for Rowan to buy the hull insurance required by Section 9(a). Rowan asserts this insurance must be in an amount at least equal to Stipulated Loss Value as of the last Hire Payment Date; however, under the Owners' construction, Stipulated Loss Value would include one component consisting of ERV as of March 15, 2008, as determined by the Appraisal Procedure. Rowan asserts it would be impossible to know how much insurance it should buy under Section 9(a).

Section 9(a) of the Charter required Rowan to maintain all-risk insurance in the greater amount of (i) the Stipulated Loss Value as of the last preceding Hire Payment Date, and (ii) "such amount as shall be sufficient to prevent the [Owners] from being a coinsurer of any loss under the applicable insurance policies." Because one becomes a coinsurer when the property is underinsured relative to its actual value, Rowan was required to maintain hull insurance at least in the amount of the fair market value of the Rowan Halifax, even during the Basic Term. *See Risdal v. Universal Ins. Co.,* 232 F.Supp. 472, 474 (D.Mass.1964) (stating that, when hull policy insures less than the full value of the vessel, the insured becomes a co-insured with the insurance company). Therefore, under the language of Section 9(a), Rowan always had a duty to obtain hull insurance for at least the full value of the Rowan Halifax, which is an amount that is not stipulated in advance and that is subject to disagreement. Rowan's corporate representative testified that Rowan's Chief Executive Officer knows the fair market value of any particular Rowan rig based on survey information and knowledge of Rowan's equipment. In addition, because, as part of the Appraisal Procedure, Rowan and Wilmington Trust could agree to the ERV as of March 15, 2008, performance would not be impossible.

Rowan also notes that, under Section 12(a), payment of Stipulated Loss Value may be due between sixty days and approximately eight months after an Event of Loss, and that, under Section 16(b), Wilmington Trust may require Rowan to pay Stipulated Loss Value within ten to thirty days after receipt of a notice. Rowan notes that, under the Participation Agreement, an Appraisal Procedure could take as long as eighty-five days to complete. Again, these provisions are not impossible to satisfy because the parties can agree or the Appraisal Procedure can take less than the full eighty-five days to conclude. In addition, the contracts do not

---

7. The first two elements are not in issue in this appeal.

state that time is of the essence, so strict compliance with these deadlines may not be required, especially in fact patterns in which the parties act diligently to obtain a prompt result from the Appraisal Procedure but are delayed by circumstances beyond their control.[8]

In sum, the Owners' construction is consistent with the language of the Participation Agreement, the Charter, and the Assumption Agreement, and it gives effect to all provisions of these contracts. The Owners' construction of Section 18 is reasonable.[9]

### Unreasonableness of Rowan's Constructions of Section 18

**1. ERV in Question as Equivalent to ERV as of September 2000 in 1984 Dollars**

Rowan asserts that, the "universal understanding," "generally prevailing meaning," and "plain meaning" of the term "estimated residual value" or ERV requires that this term be measured and fixed at the beginning of the lease or charter transaction to serve its tax purposes, rather than later on, after a loss has occurred. Therefore, Rowan points to the December 1984 appraisal concluding that the ERV of the Rowan Halifax as of September 15, 2000, was $13.3 million in 1984 dollars, and Rowan argues that this ERV must be the ERV referred to in Section 18(a) as an element of Stipulated Loss Value during the Renewal Term.[10] Likewise, Rowan argues that this "plain meaning" of ERV precludes parties from agreeing to determine a leased or chartered asset's ERV after the beginning of the lease or charter or after the loss of that asset. The language of Section 18(a) directly at issue is the following:

> the present value as of such [Hire Payment] Date [March 15, 2006] of ... the estimated residual value as of the end of such Renewal Term [March 15, 2008] (present value to be determined by using a discount rate of 10% compounded semiannually) as determined by the Appraisal Procedure.

Under Rowan's construction, the plain meaning of ERV requires that it always be calculated at the beginning of the transaction, which, in this case, was in December 1984. Therefore, according to Rowan, the plain meaning of ERV requires that the ERV mentioned in the above-quoted provision must have been equivalent to the ERV as of September 15, 2000, that was determined before the December 1984 closing to be $13.3 million in 1984 dollars. There are several problems with this construction.

Under the unambiguous language of the Participation Agreement, the 1984 pre-closing appraisal was (1) a condition prece-

---

**8.** *See Argos Res., Inc. v. May Petrol., Inc.*, 693 S.W.2d 663, 665 (Tex.App.-Dallas 1985, writ ref'd n.r.e.). In addition, Rowan's argument based on potential adjustments to Stipulated Loss Value under Article IX of the Participation Agreement lacks merit because, under the unambiguous language of that article, these adjustments would be made only in the Basic Term and not in the Renewal Term.

**9.** *See Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589–92 (Tex.1996).

**10.** Under the Participation Agreement, the acquisition of two appraisals concluding that the ERV of the Rowan Halifax as of September 15, 2000, was not less than $13.3 million was a condition precedent to the closing of the transaction in December 1984. The summary-judgment evidence contains one appraisal from December 1984 that concludes the ERV of the Rowan Halifax as of September 15, 2000, was equal to $13.3 million. The record contains no evidence of any other December 1984 appraisal or any explanation whether the other appraisal was performed or whether the parties waived the requirement of a second appraisal.

dent to closing that confirmed the accuracy of Rowan's representation and warranty, and (2) specifically required to be performed and delivered to the Owner Participant by December 28, 1984. The December 1984 appraisal does not purport to be made as part of an Appraisal Procedure under the Participation Agreement,[11] and it would be inconsistent with the language of the Participation Agreement to conclude that the ERV in this appraisal was determined by the Appraisal Procedure.[12] The unambiguous language of the contracts and the undisputed summary-judgment evidence prove that the ERV of the Rowan Halifax as of September 15, 2000, in 1984 dollars, was not determined by the Appraisal Procedure. Therefore, acceptance of Rowan's argument would render meaningless the phrase "as determined by the Appraisal Procedure" in the above-quoted provision.

Under the unambiguous language of the above—quoted provision, the ERV of the Rowan Halifax is to be determined as of the end of the Renewal Term—March 15, 2008. On the other hand, under the unambiguous language of Section 3.01(j) of the Participation Agreement, the ERV of the Rowan Halifax is to be determined as of the end of the Basic Term–September 15, 2000. Although it is conceivable that the

ERV of the Rowan Halifax might be determined by appraisers to be the same amount on both September 15, 2000 and March 15, 2008, one appraiser's determination of ERV as of the former date does not constitute an appraisal as to ERV as of the latter date. Under the Charter, the ERV of the Rowan Halifax must be determined as of March 15, 2008. Acceptance of Rowan's argument would render meaningless the phrase "as of the end of such Renewal Term" in the above-quoted provision.

Furthermore, the 1984 appraisal was required to be made in 1984 dollars. But the language in the above-quoted provision states that the ERV as of March 15, 2008, should be discounted at a specified rate to obtain the present value as of the Hire Payment Date in question during the Renewal Term, which, under the facts of this case, was March 15, 2006. As a result, the ERV in the above-quoted provision would not be calculated in 1984 dollars; rather, as applied to the facts of this case, it would be calculated in 2006 dollars.[13] By equating 1984 dollars with 2006 dollars, Rowan does not give meaning to the phrase "present value as of such [Hire Payment] Date."

None of the three contracts in question states that the determination of ERV in 1984 dollars as of September 15, 2000,

---

**11.** Indeed, uncontroverted testimony from Rowan's former Chief Financial Officer, Edward Thiele, showed that, from 1969 through April 30, 2005, there was never an Appraisal Procedure involving the appointment of one or more marine surveyors regarding the Rowan Halifax. On May 1, 2005, Thiele retired from his position as Rowan's Chief Financial Officer, Treasurer, and Senior Vice President of Finance and Administration.

**12.** For example, the Participation Agreement was executed as of December 1, 1984, and the appraisal was required by December 28, 1984; however, under the Appraisal Procedure, the appraiser or appraisers have 45 days after appointment to make the determination submitted to them. In addition, under

the Appraisal Procedure, the fees and expenses of the appraisers are paid by Rowan and Wilmington Trust; however, under Section 10.01 of the Participation Agreement and the definition of "Transaction Costs," the fees and expenses for the 1984 appraisal were paid by the Owner Participant, who, at the time, was Textron.

**13.** Earlier in Section 18(a), the parties to the Charter required, among other things, a determination under the Appraisal Procedure that the ERV of the Rowan Halifax in 1984 dollars will be "not less than" $13.3 million at the end of the Renewal Term on September 15, 2008. This determination, unlike the determination in the above-quoted provision, is also required to be in 1984 dollars.

should be used as the ERV in Section 18(a) that constitutes one part of the calculation of Stipulated Loss Value during the Renewal Term. Rowan has not cited any case in which a court has held that, under the plain meaning of ERV, this term must be calculated at the beginning of the transaction, and parties may not agree to have ERV determined after the transaction begins or after a loss.[14]

Rowan also argues that the same construction is required based on the contracting parties' purported use of the term ERV in a technical sense. Rowan asserts that ERV is a term of art in the equipment-leasing industry. However, this argument fails because the Charter and the Participation Agreement themselves do not show that ERV is used in a technical sense. *See Heritage Res., Inc.*, 939 S.W.2d at 121 (stating that terms in a contract are given their plain, ordinary, and generally accepted meanings unless the *contract itself* shows the terms to be used in a techni-

cal or different sense); *Western Reserve Life Ins. Co. v. Meadows*, 152 Tex. 559, 261 S.W.2d 554, 557–60 (1953) (holding contract term would be construed according to its plain, ordinary, and generally accepted meaning because contract itself did not show that term was used in a technical sense). In addition, even if these contracts showed that ERV was being used in a technical sense, there is no summary-judgment evidence of this alleged technical meaning. *See CDI Eng'g Group, Inc. v. Admin. Exch., Inc.*, 222 S.W.3d 544, 551 (Tex.App.-Houston [14th Dist.] 2007, pet. denied) (rejecting contention that terms were terms of art in a particular industry because there was no evidence to support this contention). In its appellate briefing, Rowan cites at least six publications in support of its arguments; however, these publications were not presented to the trial court and are not in our appellate record.[15]

Rowan construes the ERV in question as being equivalent to the 1984 appraisal of

14. Indeed, Rowan cites no cases in which courts construe the meaning of ERV in a contract, and only one case that mentions ERV. *See M & M Leasing Corp. v. Seattle First Nat'l Bank*, 563 F.2d 1377, 1381 (9th Cir.1977) (mentioning generally ERV in automobile leases). Rowan cites several cases involving contracts defining "stipulated loss value"; however, all of the contracts in these cases fix "stipulated loss value" at a specified payment, schedule, or formula, rather than having language comparable to that in Section 18(a). *See Mt. Mansfield Television, Inc. v. United States*, 239 F.Supp. 539, 544 (D.Vt. 1964); *In re Delta Air Lines, Inc.*, 370 B.R. 552, 554–55 (Bankr.S.D.N.Y.2007); *In re Lykes Bros. Steamship Co.*, 196 B.R. 574, 578 (Bankr.M.D.Fla.1996); *In re UAL Corp.*, No. 06C4243, 2007 WL 256323, at *3 (N.D.Ill. Jan. 22, 2007); *Marathon Ashland Petrol. v. Equili Co.*, No. 00Civ.2935, 2002 WL 662900 (S.D.N.Y. Apr. 23, 2002). While Wilmington Trust and Rowan could have agreed to a schedule of fixed values or a fixed value or formula for determining the ERV element of Stipulated Loss Value during the Renewal Term, they instead elected to have this ele-

ment determined by the Appraisal Procedure. In one of Rowan's cases, the court, in discussing leveraged lease transactions generally notes that "it is perhaps unnecessary to state, but important to make clear, that each leveraged lease transaction is the product of, and must be construed in accordance with, the specific contracting documents which govern the parties." *In re Delta Air Lines, Inc.*, 370 B.R. at 554. Accordingly, the court emphasizes that "each set of contractual documents comprising a transaction may contain different provisions which may dictate different outcomes of similar controversies." *Id.*

15. During parts of its opening appellate brief, Rowan seems to argue that there is a trade usage or custom as to the meaning of ERV. However, in its reply brief, Rowan clarifies that it is not asserting this argument. Even if Rowan were making this trade-usage argument, it would lack merit because there is no summary-judgment evidence regarding the alleged existence of any trade usage. *See XTO Energy, Inc. v. Smith Prod., Inc.*, 282 S.W.3d 672, 682 (Tex.App.-Houston [14th Dist.] 2009, pet. filed).

ERV as of September 15, 2000, in 1984 dollars.[16] For the reasons stated above, this construction is unreasonable.[17]

## 2. Significance of Parties' Agreement to Items in Section 18(a)'s Second Sentence

In an alternative argument, Rowan notes that the Owners have asserted that there was an implied agreement at the beginning of the Renewal Term as to the items stated in the second sentence of Section 18(a). Rowan agrees and asserts that, because such an agreement is an Appraisal Procedure, the agreed items in the second sentence determine that the ERV to be used in the fourth sentence to calculate Stipulated Loss Value is $13.3 million.

It is undisputed that there was no determination of the items in the second sentence of Section 18(a) by any marine surveyor appointed in an Appraisal Procedure. However, presuming that the parties impliedly agreed to these items by proceeding with a Renewal Term and that such an agreement was an Appraisal Procedure at the beginning of the Renewal Term, the following items would be determined in this Appraisal Procedure:

(1) The 7.5 year Renewal Term is "for a period that, when added to the Interim Term and the Basic Term, [does] not exceed 80% of the total estimated remaining economic useful life of the [Rowan Halifax] (measured from the Closing Date [December 28, 1984])"

(2) "[A]t the end of such Renewal Term [March 15, 2008] the [Rowan Halifax] will have an estimated residual value (in 1984 dollars without giving effect to inflation or deflation from the beginning of the Charter Term) ... of not less than [$13.3 million]."

(3) "[T]he use of the [Rowan Halifax] will, as of the beginning of such Renewal Term[,] be reasonably expected to be commercially feasible (in a manner that would permit [Wilmington Trust] to realize the residual value described in the foregoing clause (A)) by some Person other than [Rowan] (or any party related to [Rowan]) who could charter or purchase the [Rowan Halifax] from [Wilmington Trust] at the end of such Renewal Term."

Rowan argues that an agreement as to the second item above would be a determi-

---

16. On appeal, Rowan also relies on Statement of Financial Accounting Standards No. 13, which is not a legal authority but rather a statement of standards for financial accounting and reporting for leases. Rowan cited this document in its summary-judgment response, but it did not make it part of the summary-judgment evidence. Although Rowan provides a copy on appeal, the document is outside of the appellate record. With limited exceptions not relevant here, this court may not consider matters outside the appellate record. *See Bencon Mgmt. & Gen. Contracting, Inc. v. Boyer, Inc.*, 178 S.W.3d 198, 210–11 (Tex.App.-Houston [14th Dist.] 2005, no pet.). In any event, Rowan has cited no cases for the proposition that parties cannot agree to contractual terms and duties that differ from the Statements of Financial Ac-

counting Standards. Rowan cites *Ramco Oil & Gas, Ltd. v. Anglo Dutch (Tenge) L.L.C.*, for the court's adoption of the definition of "net worth" under generally accepted accounting principles. *See* 171 S.W.3d 905, 913–14 (Tex. App.-Houston [14th Dist.] 2005, order). However, *Ramco* is not on point because in that case this court was construing an undefined term in statutes relating to determining the bond amount needed to supersede a judgment. *See id.* at 911–14. *Ramco* did not involve the interpretation of a contract with language providing for the determination of values in a way that might be different from accounting rules. *See id.*

17. *See New Ulm Gas, Ltd.*, 940 S.W.2d at 589–92.

nation in an Appraisal Procedure that the ERV of the Rowan Halifax as of March 15, 2008, is $13.3 million. This construction conflicts with the language of Section 18(a).

First, the second item above does not say that the value must equal $13.3 million; rather, it says that it must not be less than this amount. Therefore, the implied agreement in question would be that the ERV as of March 15, 2008, is not less than $13.3 million in 1984 dollars. This does not yield an ERV for use in calculating Stipulated Loss Value in the fourth sentence. Rowan's construction would render the phrase "not less than" meaningless.

Furthermore, Rowan's construction would conflate the Appraisal Procedure mentioned in the second sentence of Section 18(a) with the Appraisal Procedure mentioned in the fourth sentence. The parties agreed that the first item in the second sentence would be "determined by the Appraisal Procedure." The parties agreed that both the second and third items would be "determined in *such* Appraisal Procedure,"[18] indicating that all three items would be determined in the same Appraisal Procedure. However, in the fourth sentence, the parties agreed that the ERV of the Rowan Halifax as of March 15, 2008, would be "determined by the Appraisal Procedure," indicating that this Appraisal Procedure would not be the same as that mentioned in the second sen-

tence. Therefore, Rowan's construction is contrary to the use of the phrase "in such Appraisal Procedure" in the second sentence.

Likewise, the unambiguous language of the second sentence speaks in terms of 1984 dollars, indicating that it is not the same calculation as the calculation in the fourth sentence, which is done in 2008 dollars that are discounted back to dollars for the appropriate year in the Renewal Term, in this case 2006 dollars.[19]

Presuming that the agreed items in the second sentence were determined by an Appraisal Procedure, this result would not determine the ERV of the Rowan Halifax as of March 15, 2008, for the calculation of Stipulated Loss Value in the fourth sentence of Section 18(a). For all of these reasons, Rowan's contrary construction is unreasonable.[20]

## CONCLUSION

Under the unambiguous language of the Charter, the ERV part of the definition of Stipulated Loss Value during the Renewal Term is determined by the Appraisal Procedure and is not set at $13.3 million at the beginning of the transaction or at the beginning of the Renewal Term.[21] *See New Ulm Gas, Ltd.,* 940 S.W.2d at 589–92. The Charter thus provides only one way for the ERV to be "determined" during the Renewal Term, and that is "by the

---

18. (emphasis added)

19. Rowan asserts that the "present value" calculation under the fourth sentence can be used to convert the alleged determination of $13.3 million in 1984 dollars in the second item into 2006 dollars. This conversion would seem contrary to the meaning of "discount." In addition, if this conversion were made using a "discount" rate of ten percent compounded semiannually, the amount of the ERV would exceed $29 million in 2006 dollars. This is not how Rowan calculated the ERV. Rowan used $13.3 million as the ERV

component in determining Stipulated Loss Value.

20. *See New Ulm Gas, Ltd.,* 940 S.W.2d at 589–92.

21. Because the contracts in question are unambiguous, this court may not consider parol evidence. Accordingly, the parol evidence cited by both Rowan and the Owners is not relevant. *See Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. CBI Indus.,* 907 S.W.2d 517, 520 (Tex.1995).

Appraisal Procedure." The plain meaning of the language of the Stipulated Loss Value definition leads to no absurd results. There is no justification for striking the requirement of the Charter that the Rowan Halifax's ERV as of March 15, 2008, be determined by the Appraisal Procedure. The record reflects that Wilmington Trust followed the Appraisal Procedure, which resulted in a determination that the ERV for the Rowan Halifax as of March 15, 2008, was $83,063,250. While Rowan has asserted that, under its construction of the Charter, the Appraisal Procedure was not available, Rowan has never challenged the Appraisal Procedure itself or the qualifications of the three independent marine surveyors. Nor has Rowan contended that there were any procedural defects in the Appraisal Procedure, or that the appraisals resulted from bias, fraud, or bad faith. Under the Participation Agreement and the Charter, these independent appraisers' determination of the ERV for the Rowan Halifax as of March 15, 2008, is "final and binding upon the parties."

Based on the plain language of the contracts, this court should affirm the trial court's judgment awarding Wilmington Trust $59,882,522.06, plus attorney's fees, prejudgment interest, and postjudgment interest. Because it does not, I respectfully dissent.